IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Case No. 09-20416-CR-DLG

UNITED STATES OF AMERICA,

                    Plaintiff,          AUGUST 17, 2009
                                        8:55 A.M.


        vs.


SHAWN M. HERNANDEZ,

                    Defendant.          PAGES 1 THROUGH 22
_____


                TRANSCRIPT OF CHANGE OF PLEA

        BEFORE THE HONORABLE DONALD L. GRAHAM
            UNITED STATES DISTRICT JUDGE


**APPEARANCES:**

FOR THE PLAINTIFF:    Ms. Cristina V. Maxwell, AUSA
                      UNITED STATES ATTORNEY'S OFFICE HIDTA
                      11200 NW 20th Street
                      Miami, Florida  33172


FOR THE DEFENDANT:    Mr. Richard D. Docobo, Esq.
                      ATTORNEY AT LAW
                      Suite 2803
                      80 S.W. 8th Street
                      Miami, Florida  33130


COURT REPORTER:       Carly L. Horenkamp, RMR, CRR
                      U.S. District Court
                      400 N. Miami Avenue, Room 13-4
                      Miami, Florida  33128
                      (305) 523-5138

1    (Open Court, 8:55 a.m.)

2        THE COURT:  Good morning, ladies and gentlemen.

3        COURTROOM DEPUTY:  <u>United States versus Shawn M.</u>

4    <u>Hernandez</u>, 09-20416-Criminal-Graham.

5        THE COURT:  Appearances, please.

6        MS. MAXWELL:  Good morning, Your Honor, Cristina

7    Maxwell on behalf of the United States.  Seated with me is

8    Patricia Thompson from the FBI.  She's a special agent.

9        THE COURT:  Good morning.

10        MR. DOCOBO:  Your Honor, good morning, Richard Docobo

11    on behalf of Mr. Hernandez, who is seated before the Court.  He

12    is in custody.

13        THE COURT:  Good morning.  Good morning,

14    Mr. Hernandez.

15        THE DEFENDANT:  Good morning, sir.

16        THE COURT:  The Court has been advised that you would

17    like to change a previously entered plea of not guilty to

18    guilty.  Is that correct, sir?

19        THE DEFENDANT:  Yes, sir.

20        THE COURT:  Please come to the lecturn with your

21    attorney and raise your right hand so that you may be sworn.

22            SHAWN M. HERNANDEZ, SWORN

23        THE DEFENDANT:  Yes.

24        THE COURT:  You are now under oath, Mr. Hernandez.

25    You must tell the truth in this morning's proceeding.  If it is

determined that you have not told the truth, you could be subject to another prosecution for perjury.  The term "perjury" means lying under oath.  Do you understand?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  If you would like to speak with your attorney, Mr. Docobo, at any time throughout this proceeding, please let me know.  Also, if I say anything that you do not clearly understand, bring the matter to my attention immediately.  Do you understand?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Please state your full name.

THE DEFENDANT:  Shawn Michael Hernandez.

THE COURT:  Your age?

THE DEFENDANT:  33.

THE COURT:  How far in school did you go?

THE DEFENDANT:  High school graduate, some college.

THE COURT:  Where did you attend high school?

THE DEFENDANT:  Key West High.

THE COURT:  And where did you attend college?

THE DEFENDANT:  Key West.

THE COURT:  Have you ever been treated for any mental illness?

THE DEFENDANT:  No, sir.

THE COURT:  Have you ever been treated for addiction to either a narcotic or non-narcotic drug?

1    THE DEFENDANT:  No, sir.

2    THE COURT:  Are you presently under the influence of

3  any drug, medication, or alcoholic beverage of any kind?

4    THE DEFENDANT:  No, sir.

5    THE COURT:  Have you received a copy of the

6  indictment?

7    THE DEFENDANT:  Yes, Your Honor.

8    THE COURT:  Have you had an opportunity to fully

9  discuss the allegations in the indictment and the case in

10  general with your lawyer?

11    THE DEFENDANT:  Yes.

12    THE COURT:  Are you fully satisfied with Mr. Docobo's

13  representation in this case?

14    THE DEFENDANT:  Yes.

15    THE COURT:  At this time, sir, I will ask you a series

16  of questions which explain the rights you have in this criminal

17  proceeding.  Do you understand you have the right to plead not

18  guilty and the right to require the government to prove your

19  guilt beyond a reasonable doubt?

20    THE DEFENDANT:  Yes.

21    THE COURT:  Do you understand you have the right to a

22  trial by jury, during which you would have the right to the

23  assistance of a lawyer, such as Mr. Docobo?

24    THE DEFENDANT:  Yes.

25    THE COURT:  Do you understand you would have the right

to see and hear all of the witnesses testify at trial and have
the government's witnesses cross-examined in your defense?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you understand you would have the right
on your own behalf to decline to testify unless you voluntarily
elect to do so?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand you have the right to
have subpoenas issued for the production of witnesses or
exhibits in your defense at trial?

THE DEFENDANT:  Yes.

THE COURT:  Do you further understand that by entering
a plea of guilty, if your plea is accepted, you will waive,
that is, give up your right to a trial and all other rights
associated with a trial as I previously explained?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  The offense or offenses to which you
propose to plead guilty are felony offenses.  If you are
adjudged guilty you could lose certain valuable civil rights in
the United States, including the right to vote, to serve on a
jury, to hold public office, and to possess a firearm of any
kind.  Do you understand?

THE DEFENDANT:  Yes, sir.

THE COURT:  Is there a plea agreement in this cause?

MR. DOCOBO:  No, Your Honor, he's pleading to six

counts as charged in the indictment.

THE COURT:  The defendant will be pleading guilty to the entire indictment?

MR. DOCOBO:  Yes, Your Honor.

THE COURT:  All right.  It was my understanding that there was a plea agreement.  Was there a change?

MR. DOCOBO:  There was a contemplated plea agreement, frankly, Judge, but to be frank about the situation, the agreement I think favored the government more than the defendant.  It restricted, in my view, arguments under 3553. It really served no advantage to my client.

THE COURT:  All right.

MR. DOCOBO:  Therefore, I have opted to plead straight up to the indictment.

THE COURT:  Very well.  The defendant desires to enter a plea of guilty to all counts in the indictment.  Government, would you list the maximum punishment for each count in the indictment, please.

Listen carefully, Mr. Hernandez.  The government is going to list the maximum penalty authorized by law for each count in the indictment.

MS. MAXWELL:  Your Honor, the maximum count is life as to Count 1, and a minimum term of imprisonment of ten years. As to Counts 2, 3, and 4, it's a minimum of five years and a maximum of 40 years.  And as to Count 6, it is a consecutive

1 minimum term of five years.

2 THE COURT: In addition to the term of imprisonment

3 for each count, Mr. Hernandez, you will be subject to a $100

4 special assessment required by law. Also, following any term

5 of imprisonment, you would be required to serve a term of

6 supervised release. Do you understand the maximum penalty

7 authorized with respect to each count in the indictment?

8 THE DEFENDANT: Yes, Your Honor.

9 THE COURT: Have you discussed this penalty with your

10 lawyer?

11 THE DEFENDANT: Yes, Your Honor.

12 THE COURT: We are unable to tell you today exactly

13 what your sentence will be, Mr. Hernandez. As you likely know,

14 after today's hearing, the United States Probation Office will

15 prepare a presentence investigation report, a copy of which you

16 and your lawyer will receive prior to the time of sentencing.

17 In that report, it will contain facts related to your

18 background, your financial scenario, family scenario, medical

19 scenario, and many other facts. In addition, the report will

20 contain the guideline computation. This is an advisory

21 guideline computation. After reviewing the report, if you have

22 objections to any of the facts or the guidelines, you may file

23 objections. The Court will entertain the objections at the

24 time of sentencing. Once the guidelines have been determined,

25 the Court may consider other statutory factors in determining

an appropriate sentence.

Do you understand?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Even though we cannot tell you precisely what your guidelines are this morning, have you had discussions with your lawyer as to how the guidelines might affect your case?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  As the government pointed out, there is also a minimum mandatory term with respect to certain counts and the law may require other counts to be consecutive to others.  Do you understand?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you understand that you will not be able to withdraw your plea solely because you are unhappy with the sentence imposed?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  In certain circumstances, the Court may depart from the guidelines by imposing a sentence which is more or less severe than required by them.  Departure issues are determined at the time of sentencing.  Do you understand?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  At this time, sir, I would like to review the counts in the indictment and explain the elements related thereto.  In Count 1, it is alleged that from on or about

February 28th, 2009, through on or about of April 11th, 2009,
in Miami-Dade and Monroe Counties, in the Southern District of
Florida, that you, sir, did knowingly conspire with others to
commit an offense; and that offense was to possess with intent
to distribute a controlled substance, that is, five kilograms
or more of cocaine.

The government would have to prove that you committed
this offense knowingly, that is, intentionally and not because
of mistake or accident.  They would have to prove that on the
dates alleged, you reached an agreement with at least one other
person, and the purpose of the agreement was to possess, that
is, to have custody or control of five kilograms or more of
cocaine with the intent to give some or all of the cocaine to
another person with or without any financial interest in the
transaction.

Do you understand the elements with respect to Count 1
of the indictment?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Count 2 --

MS. MAXWELL:  Your Honor, if I may, I apologize, it
also includes one kilogram or more of heroin.  It's at the top
of page 2.

THE COURT:  Very well.  There are two different types
of substances alleged in the indictment, that is, five
kilograms or more of cocaine and one kilogram or more of

heroin. Both substances are alleged in Count 1. Do you understand the elements, sir?

THE DEFENDANT: Yes, Your Honor.

THE COURT: With respect to Count 2, it is alleged that on or about February 24th of 2009, in Miami-Dade and Monroe Counties, that you, sir, knowingly and intentionally attempted to possess with intent to distribute a controlled substance. That substance is 500 grams or more of cocaine. This offense is referred to as a substantive offense. In Count 1 you were charged with agreeing to commit an offense. Count 2 alleges that you actually committed the offense of knowingly attempting to possess the controlled substance. Again, the government would have to prove the offense was committed knowingly, that is, intentionally, and not because of mistake or accident.

Do you understand the allegations in Count 2?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Count 3 alleges that on or about March 12th of 2009, in Miami-Dade and Monroe Counties, that you, sir, knowingly and intentionally attempted to possess a controlled substance, and that substance was 500 grams or more of cocaine and one kilogram or more of heroin. This also is a substantive offense which you would have to commit knowingly, that is, intentionally and not because of mistake or accident. Do you understand the allegations with respect to Count 3?

1    THE DEFENDANT:  Yes, Your Honor.

2    THE COURT:  Count 4 alleges that on or about

3  April 11th of 2009, in Miami-Dade County and Monroe Counties,

4  that you, sir, knowingly and intentionally attempted to possess

5  a controlled substance, and as before, it is alleged that you

6  attempted to possess 500 grams or more of cocaine and one

7  kilogram or more of heroin.  Do you understand the allegations

8  in Count 4?

9    THE DEFENDANT:  Yes, Your Honor.

10    THE COURT:  Count 5 is similar to Count 1 in that it

11  charges a conspiracy.  It is alleged in Count 5 that from on or

12  about March 12th of 2009 through on or about April 11th of

13  2009, in Miami-Dade and Monroe Counties, here in the Southern

14  District of Florida, that you, sir, did knowingly conspire and

15  agree to use and carry a firearm during and in relation to a

16  drug trafficking crime, and to possess a firearm in furtherance

17  of a drug trafficking crime.  The drug trafficking crimes are

18  set forth in Counts 1, 3, and 4 of this indictment.  Again, the

19  government would have to prove that this offense was committed

20  knowingly.  Do you understand the allegations in Count 5?

21    THE DEFENDANT:  Yes, Your Honor.

22    THE COURT:  Count 6 alleges that on or about

23  April 11th of 2009, in Miami-Dade and Monroe Counties, that

24  you, sir, did knowingly use and carry a firearm during and in

25  relation to a drug trafficking crime and did possess a firearm

in furtherance of a drug trafficking crime.  Again, the drug

trafficking crimes are set forth in Counts 1, 3, and 4 of the

indictment.  Do you understand the allegations with respect to

Count 6?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you understand the elements the

government would have to prove beyond a reasonable doubt before

you could be found guilty with regard to Counts 1 through 6 of

the indictment?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  What are the parties doing with respect to

the forfeiture allegation?

MR. DOCOBO:  I have no quarrel with the forfeiture,

Judge.

THE COURT:  I'm sorry?

MR. DOCOBO:  I have no quarrel with the forfeiture.

We're --

THE COURT:  Your lawyer has stated that with respect

to the forfeiture allegations, sir, that you will be admitting

that the government should be able to forfeit the property

referenced, that is, $11,500 in U.S. currency and any other

property derived from the offenses charged.  Do you understand,

sir, that you are giving up your right to challenge the

government's forfeiture?

THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  Any questions about anything we have

2    discussed thus far?

3          THE DEFENDANT:  No, sir.

4          THE COURT:  At this time, we will ask the government

5    to provide us with a factual basis for the allegations.  Listen

6    carefully, Mr. Hernandez.  When the government completes the

7    factual basis, I will ask you if you agree or disagree in any

8    way.

9          Government.

10         MS. MAXWELL:  Your Honor, if the government were to

11   proceed to trial, they would prove the following facts beyond a

12   reasonable doubt:

13         On or about February 24, 2009, detectives of the

14   Monroe County Sheriff's Office and agents of the Federal Bureau

15   of Investigation began an investigation into allegations of

16   corruption against Monroe County Corrections Deputy Shawn M.

17   Hernandez, the defendant.

18         A confidential source reported that while he was an

19   inmate in the Monroe County jail, he was approached by

20   Hernandez who wanted to know how much money he could make

21   transporting narcotics for the confidential source's drug

22   trafficking organization.  Hernandez explained to the

23   confidential source that he would drive his personally owned

24   vehicle, bearing a Sheriff's Association sticker, and wear his

25   corrections officer uniform, thereby avoiding scrutiny should

he be stopped while transporting narcotics.  Subsequent to this conversation, the confidential source introduced Hernandez to an undercover police officer who engaged Hernandez in several recorded telephone conversations which led to Hernandez traveling to Homestead, Florida, to meet with the undercover police officer.

On February 24th, 2009, Hernandez, in his corrections officer uniform, driving his black Acura sedan, met with an undercover police officer.  The meeting was audio and video recorded with an undercover camera and recording device.  The undercover police officer engaged Hernandez in conversations to determine whether Hernandez knew what he was going to transport and whether he was willing to do so.  Hernandez indicated that he was aware of what he was going to do and listened to the instructions given to him by the undercover police officer.  The undercover police officer told Hernandez where to deliver the kilo of cocaine and instructed Hernandez not to stop anywhere along the way until the cocaine was delivered.  Hernandez took possession of what he thought was one kilogram of cocaine.  It was actually a sham kilogram of fake cocaine.  He got into his car and proceeded to deliver the cocaine as directed.  Surveillance units followed Hernandez to the Florida Keys.  Hernandez transported one kilogram of sham cocaine to an undercover police officer on Stock Island, Florida.  For his services, Mr. Hernandez was paid $1,500 in U.S. currency.  This

event was videotaped and tape-recorded.

On February 28th, 2009, Hernandez contacted the confidential informant at his residence inquiring about another transport.  Hernandez again told the confidential source that there were other corrections officers and a Florida Fish and Wildlife officer on Big Pine Key that wanted to participate in the transportation of narcotics.  Hernandez also inquired of the confidential source about the purchase of narcotics for himself as an investment.

On March 12th, 2009, Hernandez again met the undercover police officer in Homestead, Florida.  This time, he was shown, and took possession of four kilograms of sham cocaine, and one kilogram of sham heroin locked in a toolbox.  Hernandez was instructed to deliver the box and contents to Key West, Florida.

During the drive to Key West, Hernandez pulled off the roadway and met with another vehicle described as a gray Honda Pilot.  The two vehicles then drove to a residence on Big Pine Key identified as the home of Florida Fish and Wildlife officer Jonathan S. Jacox.  Hernandez telephoned the undercover police officer and reported that he was bringing armed counter-surveillance to make sure the delivery went smoothly.  Hernandez and Jacox, in separate vehicles, then continued to the meet location.  Hernandez and Jacox were both observed talking on the cell phone during the transport.

1    Hernandez met with the undercover police officer,

2    delivered the toolbox containing the sham cocaine and heroin,

3    and was paid $5,000 for his services.  These events were

4    recorded with both audio and videotape.  Jacox remained in the

5    area during the transaction.  Hernandez told the undercover

6    police officer that he brought armed counter-surveillance and

7    that he would pay for it out of his proceeds.  Hernandez left

8    the area of the meet and went to a nearby residence.  Jacox

9    followed shortly thereafter to the vicinity of the same

10   residence.  Surveillance was terminated to avoid compromise.

11   On or about April 8th, 2009, Hernandez spoke with the

12   undercover police officer and agreed to another transportation

13   event wherein Hernandez agreed to bring Jacox to the meet with

14   the undercover police officer.  This recorded conversation led

15   to Hernandez and Jacox meeting the undercover police officer in

16   Homestead, Florida, on April 11th, 2009.  This meeting was

17   recorded and videotaped.  Hernandez arrived in his black Acura

18   sedan.  Jacox arrived in a gray Honda Pilot.  During the

19   meeting, Jacox admitted knowledge of the events -- of the last

20   event on March 12th, 2009, stating that when Hernandez stopped

21   at Jacox's home in Big Pine Key, they pried open the toolbox

22   and viewed the illegal drugs, the sham, contained inside.

23   Additionally, Hernandez and Jacox explained that Jacox's role

24   and function was armed security for the transport.  Jacox

25   showed the undercover police officer his automatic pistol.

Jacox counseled the undercover police officer on surveillance techniques from notes that he had prepared.

During this event, Hernandez and Jacox were shown the contents of the toolbox by the undercover police officer, who explained that there were four kilograms of cocaine and one kilogram of heroin (all sham).  Hernandez and Jacox were instructed to deliver the toolbox and its contents to an associate in Key West.

Hernandez placed the toolbox in his black Acura and departed the meet location.  Jacox traveled to a nearby convenience store, then also departed for Key West, catching up with Hernandez en route.  Both Hernandez and Jacox were observed talking on their cell phones during the transport.

Both vehicles remained in close proximity throughout the transport to Key West, making several overt attempts to detect surveillance by making abrupt turns and sudden stops. They again stopped at Jacox's residence in Big Pine Key before continuing on to Key West.

Both vehicles conducted more counter-surveillance on the island before Hernandez met with the undercover police officer.  Jacox waited for Hernandez to meet with the undercover police officer before parking his vehicle and entering a retail establishment offering a view of the parking lot and meet location.

Hernandez delivered the toolbox to the undercover

police officer as instructed, and was paid $5,000 for his
services.  He departed the meet location and drove to a nearby
bank parking lot where he parked and remained in his vehicle.
Surveillance was terminated to avoid compromise.

Both defendants were eventually arrested and read
their Miranda rights.  Jacox agreed to waive his rights and
told the law enforcement officers his and Hernandez's
involvement in the drug transportation.  Hernandez exercised
his right to remain silent.

THE COURT:  Mr. Hernandez, did you understand the
statement of the Assistant U.S. Attorney?

THE DEFENDANT:  Yes.

THE COURT:  Do you agree that the statement accurately
describes your conduct in this case?

THE DEFENDANT:  Yes.

THE COURT:  Do you have any questions with regard to
the statement or any changes you would like to make with regard
to the statement?

THE DEFENDANT:  No, Your Honor.

MR. DOCOBO:  In relation to that, may I make a comment
in relation to the facts?

THE COURT:  Yes, sir.  Speak into the microphone,
please.

MR. DOCOBO:  On behalf of Mr. Hernandez?  As the Court
may or may not recall during the course of the various calendar

1   calls and status conferences, obviously I pontificated, if you
2   will, in relation to a defense on my Jacobson theory as far as
3   entrapment is concerned.  We fully concede, at this point in
4   time, and Mr. Hernandez has never specifically quarreled with
5   the government's position in relation to the facts, I want to
6   make that point clear.  However, the language of the word
7   "approached" may or may not have some impact ultimately at
8   sentencing.  We fully concede, as Ms. Maxwell said, that
9   ultimately our client approached the CI; hence, no Jacobson
10  defense or no Jacobson theory as far as entrapment is
11  concerned.  However, I don't want the Court to be left with the
12  impression for sentencing that Mr. Hernandez was randomly
13  approaching prisoners to do criminal activity.  He was a guard
14  at the Monroe County jail.  That's not accurate.

15          In relation to this particular crime, there was a
16  casual conversation which kind of broke the ice for kind of a
17  relationship between this prisoner and Mr. Hernandez.  They
18  were watching television and they started to kind of get a
19  relationship where they thought about doing criminal activity
20  down the road.  Subsequently, we concede that Mr. Hernandez did
21  indeed approach the CI.  So in a vacuum, the facts are accurate
22  as Ms. Maxwell described them.  I just don't want the
23  impression being given to this particular Court that
24  Mr. Hernandez was randomly approaching prisoners for criminal
25  activity.  That is not accurate.  So if that impression was

left, I just want to assuage that ultimate issue for
sentencing.

THE COURT: The defendant has indicated that he agrees
that the statement is accurate. At the time of sentencing,
Mr. Docobo, you may argue any issues that you would like to
present to the Court.

Mr. Hernandez, has anyone attempted to force you to
plead guilty in this case?

THE DEFENDANT: No, Your Honor.

THE COURT: At this time, I will give you one last
opportunity to confer with your lawyer. When you advise me
that you are ready to proceed, I intend to accept your plea.

(Off-the-record discussion between Mr. Docobo and the
defendant.)

THE DEFENDANT: Yes, sir.

THE COURT: How do you plead to Counts 1 through 6 of
the indictment, guilty or not guilty?

THE DEFENDANT: Guilty.

THE COURT: It is the finding of the Court in the case
of the United States of America versus Sheldon -- I'm sorry,
Shawn M. Hernandez, that the defendant is fully competent and
capable of entering an informed plea, and his plea of guilty is
a knowing and voluntary plea supported by an independent basis
in fact containing each of the essential elements of the
offense alleged. Your plea is accepted. You are adjudged

1    guilty.

2            Sentencing in this cause is scheduled for Thursday,

3    October 22nd, 2009, at 9:15 a.m.  The parties are being given

4    an order on sentencing.  Please comply with the terms in the

5    order.

6            Are there any additional matters by the defense?

7            MR. DOCOBO:  No, Your Honor.

8            THE COURT:  Any additional matters by the government?

9            MS. MAXWELL:  Not from the government, Your Honor.

10   Thank you.

11           THE COURT:  Thank you very much.  We are in recess in

12   this cause.  Have a good day.

13                   (Proceedings concluded at 9:20 a.m.)

14                       *   *   *   *   *

15

16

17

18

19

20

21

22

23

24

25

1  UNITED STATES OF AMERICA                    )
                                               )   ss:
2  SOUTHERN DISTRICT OF FLORIDA                )

3

4                    C E R T I F I C A T E

5        I, Carly L. Horenkamp, Certified Shorthand

6  Reporter in and for the United States District Court for the

7  Southern District of Florida, do hereby certify that I was

8  present at and reported in machine shorthand the proceedings had

9  the 17th day of August, 2009, in the above-mentioned court; and

10 that the foregoing transcript is a true, correct, and complete

11 transcript of my stenographic notes.

12       I further certify that this transcript contains

13 pages 1 - 22.

14       IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15 Florida, this 16th day of May, 2010.

16

17

18                      s/ Carly Horenkamp
                        _____
19                      Carly L. Horenkamp, RMR, CRR
                        Certified Shorthand Reporter

20

21

22

23

24

25