```
                IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF FLORIDA
                          MIAMI DIVISION
                    Case No. 09-20416-CR-DLG

UNITED STATES OF AMERICA,

                      Plaintiff,          OCTOBER 29, 2009
                                          1:41 P.M.


         vs.


SHAWN M. HERNANDEZ,

                      Defendant.          PAGES 1 THROUGH 60
_____
```

                            VOLUME 1
                    TRANSCRIPT OF SENTENCING

              BEFORE THE HONORABLE DONALD L. GRAHAM
                   UNITED STATES DISTRICT JUDGE


**APPEARANCES:**

FOR THE PLAINTIFF:     Ms. Cristina V. Maxwell, AUSA
                       UNITED STATES ATTORNEY'S OFFICE HIDTA
                       11200 NW 20th Street
                       Miami, Florida  33172


FOR THE DEFENDANT:     Mr. Richard D. Docobo, Esq.
                       ATTORNEY AT LAW
                       Suite 2803
                       80 S.W. 8th Street
                       Miami, Florida  33130


COURT REPORTER:        Carly L. Horenkamp, RMR, CRR
                       U.S. District Court
                       400 N. Miami Avenue, Room 13-4
                       Miami, Florida  33128
                       (305) 523-5138

```
 1                    I  N  D  E  X

 2   Certificate -------------------------------------- 60

 3

 4                  W I T N E S S

 5   ON BEHALF OF THE DEFENSE:                    PAGE
     JONATHAN BENJAMIN
 6   DIRECT EXAMINATION BY MR. DOCOBO              24

 7   SABRINA McENTIRE
     DIRECT EXAMINATION BY MR. DOCOBO              26
 8
     WILLIAM FITCH, JR.
 9   DIRECT EXAMINATION BY MR. DOCOBO              28

10   PATRICIA FITCH
     DIRECT EXAMINATION BY MR. DOCOBO              28
11
     UNIDENTIFIED SPEAKER
12   DIRECT EXAMINATION BY MR. DOCOBO              29

13   CHARLES KING
     DIRECT EXAMINATION BY MR. DOCOBO              32
14
     TERESA MULLIN
15   DIRECT EXAMINATION BY MR. DOCOBO              34

16   JONATHAN JACOX
     DIRECT EXAMINATION BY MR. DOCOBO              37
17   CROSS-EXAMINATION BY MS. MAXWELL              40
     REDIRECT EXAMINATION BY MR. DOCOBO            46
18   EXAMINATION BY THE COURT                      51
     REDIRECT EXAMINATION BY MR. DOCOBO            54
19   RECROSS-EXAMINATION BY MS. MAXWELL            55

20

21

22

23

24

25
```

1        (Open Court, 1:41 p.m.)

2            COURTROOM DEPUTY:  United States versus Shawn

3    Hernandez, 09-20416-Criminal-Graham.

4            THE COURT:  Appearances, please.

5            MS. MAXWELL:  Good afternoon, Your Honor, Cristina

6    Maxwell on behalf of the United States.  Sitting at counsel

7    table with me is a detective from the Monroe County Sheriff's

8    Office, Leann Holroyd.  She was the lead agent in the case.

9            THE COURT:  Good afternoon.

10           MR. DOCOBO:  Your Honor, good afternoon.  Richard

11   Docobo on behalf of Mr. Hernandez.  Along with me is Maria

12   Elena Perez.

13           THE COURT:  Good afternoon.  And from the probation

14   office?

15           PROBATION OFFICER:  Shannon Culberson on behalf of the

16   probation department.  Good afternoon, Your Honor.

17           THE COURT:  Good afternoon.  Mr. Hernandez, have you

18   had an opportunity to review the presentence report?

19           THE DEFENDANT:  Yes, sir.

20           THE COURT:  Have you discussed the report with your

21   attorney?

22           THE DEFENDANT:  Yes, Your Honor.

23           THE COURT:  Do you have any questions concerning the

24   presentence report?

25           THE DEFENDANT:  No, sir.

1    THE COURT:  At this time, the Court will entertain the

2    objections that have been filed.  There have been a few.

3    Mr. Docobo, would you like to proceed?

4    MR. DOCOBO:  Judge, may I give an opening statement as

5    to what I believe the issues might be?  Because there might be

6    a procedural issue in relation to the safety valve and, if I

7    might, I think that virtually everything becomes moot unless

8    the Court is inclined to allow the defendant -- or grant the

9    defendant safety valve.  And if I might be so bold as to

10   perhaps hopefully frame the issue.

11        In this particular case, the defendant pled guilty not

12   only to Count 1, which is a ten-year minimum mandatory drug

13   case, but he additionally pled guilty to the 924(c).  Now, it's

14   somewhat almost counterintuitive that such a defendant might be

15   eligible for safety valve, but upon further review of both

16   5C1.2, which is safety valve, as well as the concomitant case

17   law, especially the Clavijo case out of the Eleventh Circuit --

18        THE COURT:  Especially which case?

19        MR. DOCOBO:  The Clavijo case out of the Eleventh

20   Circuit.

21        THE COURT:  All right.

22        MR. DOCOBO:  -- which is cited hopefully in my

23   pleadings, one comes to the conclusion, in my humble view, that

24   the 924(c) does not make safety valve -- a defendant ineligible

25   for safety valve.  In other words, they're not mutually

1    exclusive.  And let me explain to you what my argument is and

2    where I think that the issues lie.

3           Now, in this case -- this is one of those cases,

4    frankly I wanted to go to trial in this case.  My client wanted

5    to plead guilty.  This is one of these cases where the

6    undercover officer supplies the drugs.  And a confidential

7    informant spoke with Mr. Hernandez while Mr. Hernandez was a

8    corrections officer at the Monroe County jail.  The

9    confidential informant and him came to some sort of agreement

10   where Mr. Hernandez would transport drugs on behalf of the

11   confidential informant, or at least with some people that the

12   confidential informant knew.

13          Now, we might agree to disagree as to who started the

14   conversation.  It's not relevant for our conversations.  During

15   that particular point in time, several runs are made -- a

16   couple of runs are made by this particular defendant from

17   Homestead down to the lower Keys.  He does not possess a

18   firearm on those particular occasions.  He doesn't have a

19   firearm, never brings a firearm with him during those

20   particular occasions.

21          THE COURT:  Mr. Docobo, I must say --

22          MR. DOCOBO:  I'll get to the point in a second.

23          THE COURT:  Because you're confusing me.

24          MR. DOCOBO:  Well, because there's several trips.

25   There's more than one trip.

1          THE COURT:  Why can't we just simply entertain the

2     objections that you have raised, let me rule on those, and see

3     where that takes us?

4          MR. DOCOBO:  Well, I'm bringing us -- because I may

5     want to call witnesses on that particular issue.  I wanted to

6     call the codefendant.  And the codefendant's attorney is here.

7     Now I've been told that the codefendant may have said something

8     different than what he's told me.  And I just want to flesh

9     this out before it becomes a nightmare or nasty or whatever the

10    case may be.

11         THE COURT:  Well, I think we should litigate the

12    issues that we have raised.

13          For example, you have argued that the consecutive

14    five-year minimum sentence for the 924(c) violation does not

15    apply to a defendant who is subject to a ten-year minimum

16    mandatory term, and you cite several cases basically

17    originating from the Second Circuit.

18         MR. DOCOBO:  Correct.

19         THE COURT:  Your pleadings omit one of the key cases

20    on this issue out of the Eleventh Circuit, which is a little

21    surprising.  Counsel, as you know, should cite your position

22    and cases that support you, and if there's something germane,

23    especially within the circuit, that should be cited as well.

24         MR. DOCOBO:  Uh-huh.

25         THE COURT:  It seems to the Court that United States

1    versus Segarra addresses that identical issue in the Eleventh

2    Circuit, and so this Court is bound by Eleventh Circuit case

3    law.  So we could resolve that legal objection, we can go to

4    the other legal objections, and then we see where we are, and

5    then we argue as to what an appropriate sentence is.

6           MR. DOCOBO:  Well, the Segarra versus the Williams

7    issue I thought was relatively -- been fleshed out in other

8    courts.  I'm preserving the record on that particular issue.  I

9    understand that the Court's -- I kind of assumed that I was

10   stating out a position based on recent case law out of the

11   Second Circuit.  I suspect that there's going to be a conflict

12   and hopefully it will be resolved down the road.

13          THE COURT:  Yes, and that's really what your pleading

14   should say.  We would like you to rely on the Second Circuit's

15   position.  However, Judge, we understand that the court that is

16   binding upon you has ruled differently.  Therefore, we preserve

17   our argument.  We understand -- I mean, you may not want to go

18   that far, but we understand that you are bound by Segarra,

19   which resolves the issue, unfortunately contrary to your

20   position.

21          Does the government believe that on that particular

22   issue Segarra is dispositive of the issue?  Is there any other

23   argument that anyone can reasonably make?

24          MS. MAXWELL:  I don't believe so, Your Honor.  I think

25   Your Honor's correct.

1        MR. DOCOBO:  And I probably should have flushed this

2   out, because I think this is a debate within a debate.  In the

3   Segarra case -- and I would add this to my argument -- in the

4   Segarra case, is it not -- the guidelines nevertheless fell

5   within the range regardless of the minimum mandatory.

6        THE COURT:  Well, the proposition of the case is that

7   the Eleventh Circuit joins other circuits, not the Second, in

8   interpreting the word except.  And that clause in 924(a), to

9   limit consecutive sentences and the underlying drug crime

10  precludes one from arguing that the consecutive sentence is

11  contrary to law.  It's that basic.  And so for that reason, the

12  924(c) must run consecutive to the main count.  That's one of

13  the issues that you raised in your objections.  And for the

14  reasons just set forth, the Court overrules your objection and

15  adopts the presentence report in that regard.

16        Another objection you filed was whether or not the

17  defendant was entitled to a reduction for acceptance of

18  responsibility because the acceptance statement had not been

19  received.  The government concurs with you as to that objection

20  and recommends that the defendant receive a three-level

21  reduction for acceptance of responsibility.  Is that correct,

22  Ms. Maxwell?

23        MS. MAXWELL:  I do, Your Honor, with one caveat.  If

24  the defendant takes the stand today and gives a position on the

25  drug -- on the gun count contrary to what the facts clearly are

1    in the evidence tapes, then we reserve the right.  But

2    otherwise --

3          THE COURT:  Well, from what I've read, I don't think

4    he's disagreeing with your position that this is a valid

5    argument.  I think he's just simply stating that based upon the

6    facts, that he shouldn't be held responsible.

7          MS. MAXWELL:  What I think he's going to say, in my

8    speaking to counsel, is he's going to say that either he didn't

9    know that the gun was present or that he didn't induce the gun

10   to be present.  And the government's position is that he

11   specifically hired and went to his codefendant so that his

12   codefendant would provide the armed security, so to speak.

13         THE COURT:  I think what you are suggesting is that if

14   his testimony is contrary to that which you have on tape --

15         MS. MAXWELL:  Correct.

16         THE COURT:  -- that it would be your position that he

17   should not receive the --

18         MS. MAXWELL:  The one point, that's correct.

19         THE COURT:  -- three-level --

20         MS. MAXWELL:  Now, he hasn't said that yet and I

21   haven't heard counsel argue that yet, but if that is the case,

22   then I would just reserve on that, Your Honor.

23         THE COURT:  Well, I'm not sure what the defendant's

24   position is with respect to that objection.  So why don't we go

25   to that objection, Mr. Docobo, and tell us how you intend to

1    handle it.

2        MR. DOCOBO:  Okay.  And that's what I was talking

3    about first because I tried to get to what I thought was the

4    most important objection.  I apologize for that.  That was

5    third in my pleadings and I guess first orally.

6        This is my proffer of the facts.  The facts of this

7    case are the first two runs Mr. Hernandez doesn't bring a

8    firearm.  Mr. Jacox doesn't get involved until the last two.

9    Mr. Jacox indeed brought a gun.  Mr. Jacox did indeed show that

10   gun to an undercover officer at a particular point in time in

11   Mr. Hernandez's presence.  It certainly became clear to

12   Mr. Hernandez that he had a gun at that particular point in

13   time.  Hence, the guilty plea on the 924(c) under a

14   constructive possession theory.

15       And I would add the following.  I would add that

16   Mr. Hernandez knew that Jacox had a gun because Jacox always

17   carried a gun with him in his private life, and Mr. Jacox would

18   testify to that.

19       But I think that there's a legal issue here that we're

20   getting lost upon.  Nobody is stating that Mr. Hernandez did

21   not constructively possess Jacox's firearm at a latter point in

22   time during the course of the conspiracy.

23       THE COURT:  Well, but the government is suggesting

24   that Mr. Hernandez induced --

25       MR. DOCOBO:  That's where we disagree.

1          THE COURT:  -- overtly the bringing of the firearm.

2          MR. DOCOBO:  We disagree on that point.

3          THE COURT:  And your evidence on that point would be

4     what, Ms. Maxwell?

5          MS. MAXWELL:  Your Honor, my evidence on that point

6     would be primarily Jacox's numerous statements to us post

7     arrest, No. 1.  And No. 2 --

8          THE COURT:  To wit?

9          MS. MAXWELL:  To wit, that basically his long-time

10    friend from childhood came to him and basically begged him to

11    become involved in this and indicated to him that Mr. Jacox's

12    role in all of this would be to be armed security.  Mr. Jacox

13    never rode in the car with the defendant.  Mr. Jacox was always

14    in a separate car.  And the purpose for his existence and the

15    reason he got paid by the defendant, not by law enforcement

16    acting undercover, by the codefendant, the defendant who is

17    here today, he paid Mr. Jacox for his services for armed

18    security.

19         THE COURT:  Now, what evidence do you have of the term

20    "armed security"?  In other words, Mr. Jacox will say, He told

21    me that I should participate and provide, quote, armed

22    security?  Is that accurate?

23         MS. MAXWELL:  He said, and I don't have his exact

24    words with me, he said that the purpose for Mr. Hernandez

25    coming to him, Mr. Jacox, was so that Mr. Jacox could back him

1   up and for him, Mr. Jacox, to have his gun with him in case

2   something went wrong.

3          THE COURT:  Okay.  So you all have a --

4          MS. MAXWELL:  That's No. 1.

5          THE COURT:  All right.

6          MS. MAXWELL:  No. 2, the defendant brags to the

7   undercover agent acting as a drug dealer that he was able to

8   procure armed security or a backup with a gun or --

9          THE COURT:  All right.  Now give me the specific

10  language.

11         MS. MAXWELL:  Can I have one moment to -- and Your

12  Honor, and I apologize, I would have had all those tapes here

13  and I would have had all my case files, but counsel didn't file

14  his objections until about two days ago and I didn't know that

15  there were going to be any witnesses called.  I thought that we

16  were all -- based on the discussions that we had had with this

17  defendant as well, I thought that we were all pretty much on

18  board as to the facts, what the facts were, and counsel was

19  going to argue a different interpretation of the law.  So I

20  apologize for my not having the tapes or my agent's reports

21  here, but that's the reason why.

22         THE COURT:  All right.

23     (Off-the-record discussion.)

24         MS. MAXWELL:  From this agent's recollection, which he

25  remembers was on the second run, because there were three, he

1    transports one kilogram of cocaine, then the second run I

2    believe is one kilogram of heroin and four kilograms of

3    cocaine.  At that point is when Jacox is first observed by law

4    enforcement.  The undercover asks this defendant, Hey, who's

5    that other guy?  And Mr. Hernandez responds that that's a

6    friend that I brought for firepower because this is a lot of

7    dope that I'm transporting.

8              THE COURT:  Now, you're quoting from a transport or

9    what?

10             MS. MAXWELL:  I'm quoting from this agent's

11   recollection of the audiotape from the undercover deal because

12   it was all videotaped and audiotaped.

13             THE COURT:  So it's pretty easy to determine what was

14   said.

15             MS. MAXWELL:  Absolutely, yes.  And then there was a

16   third run.  On the third run is when Mr. Jacox is actually

17   introduced to the undercover.  There is a very long meeting in

18   a pickup truck with the undercover, Mr. Hernandez, and

19   Mr. Jacox.  And in that meeting, they talk about the gun, they

20   show the gun -- well, Mr. Jacox shows the gun, Mr. Hernandez is

21   there, and basically he talks about how his purpose in this

22   whole thing is to be the security who has the gun.

23             THE COURT:  And you take issue with those facts,

24   Mr. Docobo?

25             MR. DOCOBO:  I'm reticent to call someone -- it's not

```
 1          on the tapes.  It's not in the transcripts that I've heard.

 2                    THE COURT:  Well, she claims that it is.

 3                    MR. DOCOBO:  Well, let's --

 4                    THE COURT:  That's why I asked.

 5                    MR. DOCOBO:  If they have some enhancement on the tape

 6          or a transcript I haven't seen, I'm more than willing to look

 7          at it.

 8                    MS. MAXWELL:  He has everything.

 9                    MR. DOCOBO:  Well, it's not in the transcripts that

10          I've been provided or I've never heard it.  I've never heard

11          the word "firepower" ever and I've readily told the Court that

12          we have no dispute with the fact that he showed the firearm.

13          The issue is possession, actual possession for the safety valve

14          purpose; and B is whether or not he induced.  Really, I think

15          it's maybe a semantical argument.  He never asked Jacox to

16          bring a gun.  Jacox always carried a gun and he happened to

17          have a gun.

18                    THE COURT:  But you all have a dispute as to what the

19          facts are, see, that's the issue here.

20                    MR. DOCOBO:  Obviously.

21                    THE COURT:  So the way we resolve that is for the

22          parties to present the transcripts or tapes so I can determine

23          what was said.  Frankly, I mean, given the concept of relevant

24          conduct, if you ask a police officer to serve as security, one

25          would readily suspect that they would have a firearm, I would
```

1   think.  Is it clear that he was supposed to be in uniform?

2           MR. DOCOBO:  No.  Well, he wasn't, A; and B, he

3   brought his personal gun, not his service revolver.  The .40

4   caliber is not a service revolver.  Jacox, I mean.

5           THE COURT:  Do you have the transcripts?

6           MR. DOCOBO:  I don't have a transcript where it says

7   anything about, that I told him to bring a gun.

8           THE COURT:  Do you have the transcripts?

9           MR. DOCOBO:  I have the transcripts, yes.

10          THE COURT:  Because maybe, Ms. Maxwell, you can take a

11  quick look and find the paragraph you're referencing.

12          MS. MAXWELL:  I can certainly look at them, Your

13  Honor.  I don't have any transcripts.  I don't have any tapes.

14  I can only go by my recollection, the lead agent's

15  recollection, and based on all the meetings that I sat in on

16  with Mr. Jacox.  And I apologize, Your Honor, but again, I

17  received this late.  I responded to it as soon as I could.

18          THE COURT:  Was this submission, your pleading, in

19  conformity with the Court's scheduling order which we told you

20  to abide by?

21          MR. DOCOBO:  Judge, I'm looking at the PSI objections,

22  there was no question about it, but it wasn't two days ago, it

23  was last week, and the reason why is because --

24          MS. MAXWELL:  It was actually Friday after hours.

25          MR. DOCOBO:  I'm caught between the proverbial rock

 1    and a hard place when I have a client that's attempting to

 2    cooperate and the cooperation doesn't come to fruition because

 3    he doesn't know enough.

 4            THE COURT:  What does that have to do with filing a

 5    pleading on time?  I don't understand.

 6            MR. DOCOBO:  Because I don't want to raise these

 7    issues if I was going to get a 5K.

 8            THE COURT:  But you file it on time if it's not

 9    resolved.

10            MR. DOCOBO:  I didn't want to raise the ire of the

11    spirit of the cooperation.

12            THE COURT:  No, you're not following me.  Assuming you

13    don't want to raise someone's ire, you file your pleading at

14    the latest possible time in accordance with the administrative

15    order, which would be a timely submission.

16            MR. DOCOBO:  I understand that, Judge, and I was late.

17            THE COURT:  Well, I don't have any choice but to

18    continue this matter until you all are able to respond.  Does

19    the probation officer have any transcripts or reports on this

20    point?

21            PROBATION OFFICER:  Your Honor, I can double-check the

22    file, but I don't believe there are any transcripts in there.

23            THE COURT:  All right.

24            MS. MAXWELL:  I don't think it's something that we

25    would have sent.

1        THE COURT:  I'm sorry?

2        MS. MAXWELL:  That's not something we would have sent

3   to probation, Your Honor, unless they specifically asked for

4   it.

5        MR. DOCOBO:  I can't even find mine.  I just had them

6   right in front of me.

7      (Off-the-record discussion.)

8        THE COURT:  Are there other issues we can resolve or

9   other objections other than this particular issue?

10        MR. DOCOBO:  Judge, I think we do have rulings on

11   acceptance -- we already had rulings on acceptance and the

12   consecutive nature of the 924(c).  The public trust is still an

13   issue out there floating.  I think we can agree on the facts on

14   that one.

15        THE COURT:  I recall a number of cases on the public

16   trust issue.  Why don't you argue your position, counsel?

17        MR. DOCOBO:  My position is simple: he's too low level

18   of a player in the law enforcement chain for this to be

19   attributable to him.  He's a corrections officer.  He's not a

20   police officer.  He wears his uniform on one particular

21   occasion to meet, doesn't use his uniform on all occasions.

22   And it's his -- the fact that he's a corrections officer delves

23   into and is instructive, if you will, in the nature of the

24   relationship between him and the CI, how they met.  Not really

25   how they met, but why they would engage in this kind of

1    conversation.  They've known each other since they were kids,

2    the CI and Shawn.  He's known him before he was an inmate.  All

3    of this took place after the confidential informant was

4    released as an inmate in the Monroe County jail.  And in our

5    view, although he makes statements that if stopped, his

6    corrections officer uniform would be helpful in his vehicle not

7    being searched or in alerting fears of law enforcement, I

8    don't -- my position, from a fact-driven standpoint, his

9    position as a corrections officer, not a police officer, Jacox

10   is the police officer, not my client, that it's so -- it's

11   diminimous in the concept of the entirety of the plan.

12            THE COURT:  Did you read United States versus Brown, a

13   Fifth Circuit case which seems to be on point, where the

14   enhancement was upheld?  And the case involved a corrections

15   officer that was involved in a drug conspiracy involving an

16   inmate.

17            MR. DOCOBO:  Right, but in that --

18            THE COURT:  That seems to be --

19            MR. DOCOBO:  Right, I am familiar with that case, but

20   he was an inmate at the time of the involvement.

21            MS. MAXWELL:  Your Honor, in this case --

22            MR. DOCOBO:  That was a corrections officer bringing

23   in drugs, if I'm not mistaken, the Fifth Circuit case.

24            THE COURT:  All right.

25            MS. MAXWELL:  Your Honor, counsel is mistaken as to

```
 1      the facts of this case.  The first --

 2              MR. DOCOBO:  Of this case --

 3              MS. MAXWELL:  This case.

 4              MR. DOCOBO:  -- or the Fifth Circuit case?

 5              MS. MAXWELL:  No, of this case.  I know that counsel

 6      disputes the fact that his client is the one who approached the

 7      CI.  Let's put that aside even though our position is different

 8      in that.

 9              THE COURT:  He was an inmate, wasn't he?

10              MS. MAXWELL:  He was an inmate at the time.

11              THE COURT:  Yes.

12              MS. MAXWELL:  And at the time that that inmate gave

13      the telephone number of the undercover police officer to this

14      defendant, he was still an inmate.  This all happened while

15      this person was -- excuse me, I'm sorry.

16              MR. DOCOBO:  That's not true.

17              MS. MAXWELL:  Hernandez gave his phone number, the

18      defendant gave his phone number to the confidential informant

19      while the confidential informant was still in jail.  So the

20      initial conversations that are taking place regarding the

21      ability to do any type of work together happens while the

22      confidential informant is still an inmate and this man, for

23      lack of a better term, is his jailer, is his corrections

24      officer.

25              Additionally, this defendant was not wearing his
```

1   uniform, but had his uniform very well displayed in his car

2   when he first met with the undercover police officer to take

3   transport of the one kilogram of cocaine.  Excuse me, wore it

4   on the first transport, hung it in his car on the second

5   transport.  Additionally, indicated to the undercover police

6   officer that if he were going to get pulled over, he would

7   display his license in a way that his credentials would be made

8   known to the police officer who may happen to pull him over for

9   any traffic violation.  So that he was going to make it known

10  to whoever pulled him over that he's law enforcement and

11  therefore he would be let go and the cocaine would not be

12  discovered.

13          MR. DOCOBO:  Judge, that's exactly what I said.  I

14  don't disagree with any of those statements and I wasn't

15  mistaken on the facts.  But the fact, the operative fact which

16  distinguishes this from that Fifth Circuit case and makes this,

17  the fact that he's a corrections officer, totally incidental to

18  his behavior in the criminal activity, is that he knew the

19  informant, George, who is referenced in the tapes, prior to

20  George being an inmate, they had a conversation while watching

21  the movie *The Usual Suspects*, where they kind of joked and

22  said, Wow, you could do that, Shawn, for me.  They didn't have

23  a further conversation about criminal activity until George was

24  released as a prisoner and George called Shawn as a friend, not

25  as a correctional officer.

 1          However, I freely admit that once he met the

 2    undercover officer, he did make a statement to the undercover

 3    officer that, if stopped, he's more likely -- less likely to

 4    come -- to be suspicious because he indeed is a corrections

 5    officer and could display his corrections officer credentials

 6    if stopped.  But there is no disagreement on those basic facts.

 7          In my view, this does not rise to the level of a

 8    public trust.  The Fifth Circuit case is not, quote-unquote, on

 9    point because there was a direct correlation between the

10    correction officer's work as a correction officer and the

11    criminal activity; i.e., bringing drugs in and around prison.

12          THE COURT:  All right.  Well, the fact of the matter

13    is --

14          MR. DOCOBO:  And there's plenty of Eleventh Circuit --

15    I didn't mean to interrupt, I'm sorry.

16          THE COURT:  Regardless of their prior relationship,

17    many of the acts in furtherance of the offenses in this case

18    were committed during the relationship of corrections

19    officer/prisoner.  Also, the conversation about him being less

20    likely to be stopped or searched or otherwise because of his

21    uniform further demonstrates that his position is crucial to

22    the conspiracy.  3B1.3 requires that if the defendant abused a

23    position of public trust -- or private trust, not the case

24    here, or used a special skill in a manner that significantly

25    facilitated the commission or concealment of the offense, you

```
 1        increase by two levels.

 2              Based upon the facts as you all have argued them, the

 3        Court finds that the enhancement of a two-level increase is

 4        appropriate.  The defense has not met its burden in

 5        establishing that 3B1.3 does not apply.  Accordingly, the

 6        objection is overruled.

 7              MR. DOCOBO:  Judge, may I -- just so we know what

 8        my -- the factual distinction that I'm making --

 9              THE COURT:  I understand your argument.  Mr. Docobo, I

10        disagree with your argument.  Your objection is overruled.

11              MR. DOCOBO:  Okay.

12              THE COURT:  All right?

13              MR. DOCOBO:  All right.

14              THE COURT:  I've read your pleadings, I've listened to

15        your argument, I understand fully your position.

16        Unfortunately, the Court disagrees with your position

17        consistent with the law in this cause.

18              All right.  What else would you present in aid of

19        sentencing?  Are there witnesses that you contemplated calling

20        in aid of sentencing only?  Because if so, I'm happy to

21        entertain those witnesses now.

22              MR. DOCOBO:  Well, the only witness I had in relation

23        to the sentencing guidelines is Mr. Jacox.  3553 witnesses are

24        present before the Court.

25              THE COURT:  Do you want to call him on that issue?
```

1    You're welcome to do so.

2              MR. DOCOBO:  Well, I thought we were going to resume

3    calling Mr. Jacox until a later date to resolve the safety

4    valve issue.

5              THE COURT:  No, I didn't say I was going to resume to

6    call Mr. Jacox.  I said we were going to resume so that I could

7    view the transcripts because the government didn't have time to

8    present them -- to get them because your submission was late.

9    I'm happy to entertain any other evidence you want to present

10   other than the transcripts that the government will have an

11   opportunity to obtain later.  So any evidence you want to

12   present on the subject, let's take that up now.

13             MR. DOCOBO:  Including the safety valve subject, yes,

14   that's what you --

15             THE COURT:  Yes.

16             MR. DOCOBO:  Okay.  May I have one moment?

17             THE COURT:  Yes, sir.

18        (Off-the-record discussion.)

19             MR. DOCOBO:  Judge, may I proceed with the 3553

20   witnesses at this point in time?

21             THE COURT:  Yes, sir.

22             MR. DOCOBO:  Okay.  At this time we'll call Jonathan

23   Benjamin, please.

24             THE COURT:  All right.

25             MR. DOCOBO:  Where would you like him to stand, Your

```
 1    Honor?
 2              THE COURT:  Any way you would like to handle it, sir.
 3    Should he be sworn?
 4              MR. DOCOBO:  Excuse me?
 5              THE COURT:  Should the witness be sworn?
 6              MR. DOCOBO:  I presume so.
 7              THE COURT:  I'm sorry?
 8              MR. DOCOBO:  Yes, Your Honor.
 9              THE COURT:  All right.  Would you swear the witness,
10    please.
11              COURTROOM DEPUTY:  Raise your right hand, please.
12            JONATHAN BENJAMIN, DEFENSE WITNESS, SWORN
13                      DIRECT EXAMINATION
14    BY MR. DOCOBO:
15    Q.   State your name, please.
16    A.   My name is Jonathan Benjamin.
17    Q.   And your relationship to Shawn Hernandez?
18    A.   We've been extremely close friends for about 12 years.
19    Q.   Mr. Benjamin, I know that you've written a letter to the
20    Court.  Is there anything you would like to tell the Court
21    personally in reference to Mr. Hernandez's sentencing?  And
22    feel free to do so.
23    A.   Okay.  I'm sure I'm going to probably say a lot of the
24    same things that other people are going to say, but I want to
25    respect the Court's time so I'll be as brief as I possibly can
```

1    about someone that I have so many feelings for.

2        This is someone who has done ultimately more good in his

3    life than wrong and that's for sure.  He doesn't have a

4    criminal history or background.  Me personally, in my life,

5    he's helped me so many times with my first business.  He gave

6    me money out of his pocket when I couldn't pay the bills for

7    the business, when it wasn't doing well.  He never asked for

8    this money back.  And, you know, those are the types of things

9    that he's always done for everyone around him, including

10   myself, multiple times.  And if ever he was around my mom's

11   house when I was in college, when I was away, he'd stop, he'd

12   help her, he'd clear her gutters out, mow her lawn.  Everything

13   he does in his life is just, he puts other people first, even

14   when it's putting himself last and behind possibly, maybe to

15   his own detriment.

16       I've watched him raise my sister-in-law's son like it was

17   his own for the last three years.  And he's got no children of

18   his own and I didn't even know he liked kids.  And it's the

19   most amazing relationship I've ever seen.  It's shown me how I

20   need to be with my new daughter that has just been born.

21       I don't know, you know, the circumstances that led up to

22   this and how, you know, this choice or decision was made and

23   why, but I can tell you this: what he's already lost in the

24   time that he's served is enough ironically that he would never

25   make another mistake ever again.  That I believe wholeheartedly

 1 | in the bottom of my soul.  That's all I have, Your Honor.
 2 |          THE COURT:  Thank you very much, sir.
 3 |          MR. DOCOBO:  Thank you, Mr. Benjamin.
 4 |          THE COURT:  I'm sorry, I didn't mean to preclude the
 5 | government.  Did you have any questions of the last witness?
 6 |          MS. MAXWELL:  No, Your Honor.
 7 |          THE COURT:  All right.  Thank you.
 8 |          Good afternoon.  Your name, please.
 9 |          MS. McENTIRE:  Sabrina McEntire.
10 |          THE COURT:  All right.  Ms. McEntire, would you raise
11 | your right hand?
12 |          SABRINA McENTIRE, DEFENSE WITNESS, SWORN
13 |                    DIRECT EXAMINATION
14 | BY MR. DOCOBO:
15 | Q.   Could you explain your relationship to the defendant,
16 | Mr. Hernandez?
17 | A.   Significant other for about three and a half years.
18 | Q.   Is there anything you would like to tell the Court about
19 | Mr. Hernandez in relation to his sentence?
20 | A.   Yes.  I don't really know where to begin.  He's definitely
21 | been the best thing that's ever happened to me.  He's shown me
22 | what it is to be a good person and he's got the biggest heart
23 | that I know.  I've never met anybody else who cares about other
24 | people the way that he does, including my son.
25 |      When we first started dating, my son was about a year and

```
 1    a half old, and he changed his diapers, he actually was the
 2    first person to potty-train him, now that I look back and think
 3    about it.  But not only, you know, has this past six months
 4    been terribly hard on myself and my son, but my son has also
 5    asked about him every single day.  He talks about him every
 6    day.  He wants to see him.  And I mean, we miss him terribly
 7    and just want him to come home as soon as possible.  I know
 8    that I don't -- I don't know exactly what happened, but I just
 9    know that we want him home as soon as possible.  And my son
10    misses him and he asks about him every single day.  Everything
11    he does reminds him of him.  He says, you know, my -- you know,
12    he calls him "my Shawn" and he says, My Shawn helped me, you
13    know, tie my shoes and, you know, everything.  So I just want
14    him to come home soon.
15              THE COURT:  All right.  Government, any questions?
16    Government, any questions?  Ms. Maxwell?
17              MS. MAXWELL:  I'm sorry, Your Honor.  No, no
18    questions.
19              THE COURT:  All right.  Thank you very much, ma'am.
20    You may be seated.
21              Please state your name, sir.
22              MR. FITCH:  William Fitch, Jr.
23              THE COURT:  All right.  Mr. Fitch, please raise your
24    right hand.
25               WILLIAM FITCH, JR., DEFENSE WITNESS, SWORN
```

```
1                        DIRECT EXAMINATION

2    BY MR. DOCOBO:

3    Q.   Your relationship with Shawn Hernandez?

4    A.   I guess you would call me his stepfather or whatever, but

5    I'm his dad.

6    Q.   Is there anything you would like to say to the Court?

7    A.   Yeah.  I -- I don't understand what happened, I really

8    don't.  He's been with me ever since he was in diapers and I

9    just can't believe that all of this went down.  He wasn't

10   brought up like that and it's just -- he's been helping the

11   family, and I feel like it's my fault 'cause things have been

12   so bad on us that he probably put it on his shoulders to try to

13   help out and -- which he was helping us.  He helped pay a

14   couple of payments and stuff for us and helped keeping us

15   moving along.  But, I just don't know what happened, you know.

16   He was tricked, I guess.  He would have never done anything

17   like that without the pressure, probably.

18            THE COURT:  All right.  Government, any questions?

19            MS. MAXWELL:  No, Your Honor, thank you.

20            THE COURT:  Thank you very much, Mr. Fitch.

21            PATRICIA FITCH, DEFENSE WITNESS, SWORN

22                        DIRECT EXAMINATION

23   BY MR. DOCOBO:

24   Q.   Your relationship to Mr. Hernandez, Shawn?

25   A.   I'm Shawn's mom.
```

1    Q.   Okay.  Is there anything you'd like to tell Judge Graham?

2    A.   We don't know what happened, but Shawn's always been there

3    for us.  You know, he wanted to go to corrections school.  He

4    went.  He was home every day.  He's never given us any trouble.

5    In -- I don't know, I'll take him any way that you give him

6    back to me.

7             THE COURT:  All right.  Government, any questions?

8             MS. MAXWELL:  No, Your Honor.

9             THE COURT:  Thank you very much, ma'am.

10            MR. DOCOBO:  Thank you, Your Honor.

11            UNIDENTIFIED SPEAKER, DEFENSE WITNESS, SWORN

12                         DIRECT EXAMINATION

13   BY MR. DOCOBO:

14   Q.   Your relationship to Shawn?

15   A.   I would have been his mother-in-law.  That was my

16   daughter, Sabrina.  I just wanted to verify pretty much what

17   she said.  And he's done nothing but help us.  I was in a car

18   accident and he would check my oil and fill my tires with air

19   and make sure that I was okay.  And whatever you're sentencing

20   him to, you're sentencing us to also.  We just want him to come

21   home.  He's not a bad person.  And I'm sorry.  He was only

22   trying to help us.

23   Q.   When you say he was only trying to help us, hopefully the

24   Court might be interested in the financial hardships that the

25   family was going through at the time that this crime was

```
 1   committed.
 2   A.   I was in a really bad car accident and I'm on disability,
 3   and my boyfriend of six years left me in a house I couldn't
 4   afford.  And Shawn was there for me.  He was there for my
 5   grandson.  He bathed him and got him ready for school and loved
 6   him and played with him.  And Ryan asks about him every single
 7   day.
 8   Q.   Where were you living at the time that Shawn was arrested?
 9   You were living in --
10   A.   That house.
11   Q.   In Winter Haven?
12   A.   Uh-huh, in Winter Haven.
13   Q.   And Shawn would drive from Key West to Winter Haven how
14   often?
15   A.   As much as he could get off to come and see us.
16   Q.   So when he wasn't working, he was in Winter Haven with --
17   A.   With us.
18   Q.   And --
19   A.   He lived with me for a couple of months while they were
20   looking for an apartment.  And he's never done a mean thing in
21   his life.  And I don't really know what happened here either.
22   All I know is that I know if you let him go, he would never,
23   ever even jaywalk or do anything bad ever again.  I think it's
24   hurt him more than anything that probably could ever happen to
25   him in his life.  And we are being sentenced also here today
```

1    and a piece of our heart is going to die every day that we're

2    not with him.

3              THE COURT:  All right.  Ma'am, I would request that

4    you discuss with Mr. Docobo the sentencing system and the

5    guideline range.

6              UNIDENTIFIED SPEAKER:  I understand, Your Honor.

7              THE COURT:  I'm not exactly sure what you mean by let

8    him go.

9              UNIDENTIFIED SPEAKER:  I'm asking for the minimum that

10   you could possibly allow under the law.

11             THE COURT:  All right.  The law, the guidelines, and

12   the sentencing system is frankly pretty harsh and sometimes

13   folk don't really understand the seriousness of the offenses or

14   the way the system works.

15             UNIDENTIFIED SPEAKER:  No, I understand it.

16             THE COURT:  I'm sure Mr. Docobo can provide you with

17   some additional information.  But your information about

18   Mr. Hernandez is very helpful and I appreciate it.

19             UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

20             THE COURT:  Anything by the government?

21             MS. MAXWELL:  No, Your Honor.  Thank you.

22             MR. DOCOBO:  Judge, may I ask her one more question?

23             THE COURT:  Certainly.

24   BY MR. DOCOBO:

25   Q.   When Shawn was -- in order to save money to help both your

1    family and Shawn's parents, where would Shawn live when he was

2    in Key West?

3    A.   He lived at the jail so he could save money and he pretty

4    much lived out of his car.  So he would have his uniform in

5    there and other things.  I believe Ryan's blanket's in his car,

6    too.

7         MR. DOCOBO:  I have nothing further.  Thank you.

8         THE COURT:  All right.  Thank you, ma'am.

9         MR. DOCOBO:  Judge, there are letters in the file

10   which I've addressed to the Court.  I'm only going to present

11   two more witnesses.

12        THE COURT:  Yes, sir.  I do have the letters.  Yes,

13   sir, your name, please?

14        MR. KING:  Charles King.

15        THE COURT:  All right.

16             CHARLES KING, DEFENSE WITNESS, SWORN

17                      DIRECT EXAMINATION

18   BY MR. DOCOBO:

19   Q.   Is there anything you would like to tell the Court about

20   Mr. Hernandez?

21   A.   Yeah.  Shawn's my brother.  I mean, we're cousins, but --

22   we were raised in two different households as brothers.  I

23   don't think any of us are naive enough to think that he's going

24   to walk home today.  However, we do know that what he was doing

25   was not to advance his status in the drug world or anything

1    like that.  He was trying to help a father who had cancer, a

2    mother who has heart problems, a sister who has turned her life

3    around and is in -- on the way right, or is right.  It was an

4    honest stupid mistake.  I mean, he's a naive guy, he's been a

5    naive kid.  He -- sorry.  He was doing right by doing wrong,

6    Your Honor.  I'm not stupid enough to think you're not going to

7    sentence him to the guidelines, but we ask you to take into

8    consideration what he was doing it for.  I could see you

9    throwing the book at him if he was doing it to further himself

10   in the criminal life, but it wasn't that.  It was -- it was --

11   I'm trying to say this where it doesn't sound like it's -- he

12   was doing it to help his family.  His heart was in the right

13   spot, but what he was doing wasn't the right thing to do.  We

14   all know that.  He knows that.  He probably is kicking himself

15   in his butt every day that he's laying in his bunk where he's

16   laying.

17        I guess we would just ask that you look through the

18   current and just see that given an opportunity -- I mean, it's

19   his first real mistake, you know, and I don't think anybody

20   should have to pay with 15 years of their life on a mistake

21   that although was against the law, it was in -- he had his

22   heart in the right place.  Maybe not his head, but he did have

23   his heart in the right place.  And we all love and support him.

24   We know it was a mistake.  And that's it.  I mean --

25             MR. DOCOBO:  Thank you very much.  Appreciate it.

```
 1    Maybe the government would want to ask you questions.

 2              MS. MAXWELL:  No, Your Honor, no questions.  Thank

 3    you.

 4              THE COURT:  Thank you, sir.

 5              Your name, please?

 6              MS. MULLIN:  Teresa Mullin.

 7              THE COURT:  All right.  Ms. Mullin, you may proceed.

 8    Any questions or just --

 9              MR. DOCOBO:  I thought we were swearing.

10              THE COURT:  Swear the witness, please.

11              TERESA MULLIN, DEFENSE WITNESS, SWORN

12                      DIRECT EXAMINATION

13    BY MR. DOCOBO:

14    Q.   Could you state your name for the record, please?

15    A.   Teresa Mullin.

16    Q.   Is there anything you would like to tell the Court in

17    relation to Shawn?

18    A.   I guess I would just second everything that you just heard

19    from --

20              THE COURT:  Could you pull the microphone down a bit?

21    Thank you.

22    A.   It broke.  Sorry.  I guess I would second everything that

23    Charles just said.  Shawn is my cousin.  He's been a very big

24    part of my life.  He made a mistake, as Chuck just said.  We

25    don't expect him to walk out of here, but we would ask to --
```

1    consideration be taken.  This is his first offense.  His heart

2    was in the right place, but he knows he made a mistake.  What

3    he was doing, he supports his mother, his father, his sister,

4    he was supporting a girlfriend with a three-year-old child.

5    That does not make it right, I'm not saying that in the least,

6    but he was living at the jail to pay everybody else's rent.  He

7    made a mistake and I know he is very sorry for that mistake.

8    And I would just hope that you guys can take into consideration

9    everything that you heard here today and know that he has truly

10   learned from this mistake.

11              THE COURT:  All right.  Thank you very much.

12              Ms. Maxwell?

13              MS. MAXWELL:  No questions, Your Honor.  Thank you.

14              THE COURT:  You may be seated, ma'am.  We appreciate

15   you coming in.

16              MR. DOCOBO:  Judge, my next witness would be

17   Mr. Jacox.  It's my understanding that the government would ask

18   to cross-examine Mr. Jacox at a later point in time.  With that

19   in mind, I would respect --

20              THE COURT:  I don't know about that.  My understanding

21   is that the hearing is being continued in order to give the

22   government an opportunity to present tape-recordings,

23   et cetera.

24              MS. MAXWELL:  I also have lots of debriefing notes

25   from his conversations.  When I told Your Honor that one of the

 1   main pieces of evidence to support the inducement issue was

 2   Mr. Jacox's own statements -- we met with him various times.  I

 3   mean, I sat in on some.  I don't know that I sat in on all of

 4   them.  But my own personal recollection is he using the words

 5   "begged."  That Mr. Hernandez begged him to become involved.

 6            THE COURT:  All right.  Well, we'll hear the direct

 7   and then we can see how far we can go.

 8            MS. MAXWELL:  Okay.

 9            THE COURT:  You can listen to it and decide if you

10   need to consult your notes or otherwise.

11            MR. DOCOBO:  Mr. Jacox is in custody, so I'd ask the

12   marshals to bring him in.

13            MR. BARZEE:  Your Honor, may I address the Court,

14   please?

15            THE COURT:  Yes, sir.

16            MR. BARZEE:  William Barzee.  I represent Jonathan

17   Jacox and I would just ask the Court for permission to speak to

18   him briefly before he's sworn in and takes the stand.

19            THE COURT:  Yes, sir.

20            MR. BARZEE:  Thank you, Your Honor.

21        (Off-the-record discussion between Mr. Barzee and Jonathan

22   Jacox.)

23            MR. BARZEE:  Thank you, Your Honor.

24            THE COURT:  Yes, sir.

25                JONATHAN JACOX, DEFENSE WITNESS, SWORN

```
 1                          DIRECT EXAMINATION

 2   BY MR. DOCOBO:

 3   Q.   Could you please state your name for the record?

 4          MR. DOCOBO:  Has he been sworn?

 5          COURTROOM DEPUTY:  Yes.

 6          MR. DOCOBO:  Okay.

 7   BY MR. DOCOBO:

 8   Q.   Could you please state your name for the record, sir?

 9   A.   Jonathan Scott Jacox.

10   Q.   And are you familiar with the defendant presently before

11   the Court, Mr. Shawn Hernandez?

12   A.   Yes, sir.

13   Q.   How would you describe your relationship with

14   Mr. Hernandez?

15   A.   Best friend.

16   Q.   And do you recall making two narcotics related trips

17   between the Homestead area and the lower Keys?

18   A.   Yes, sir.

19   Q.   And did the first trip take place approximately around

20   March 12th, 2009?

21   A.   To the best of my memory, yes, sir.

22   Q.   And the subsequent trip was in April of 2009?

23   A.   I believe so, yes, sir.

24   Q.   Okay.  Prior to the March trip, did you have any

25   conversations with Mr. Hernandez where he urged you to bring
```

```
1    your firearm when assisting Mr. Hernandez?

2    A.   No, sir.

3    Q.   Did he ever ask you to bring a gun?

4    A.   No, sir.

5    Q.   Did he ever induce you to bring the firearm which you had

6    in your possession on those two trips?

7    A.   Can you elaborate on induce?

8    Q.   Did he attempt to persuade you verbally?

9    A.   Not verbally, no.

10        THE COURT:  In any other fashion?  You said not

11   verbally.  In any way were you asked, persuaded, requested,

12   suggested to bring a firearm?

13   A.   He made a hand gesture, Your Honor.

14        THE COURT:  And would you explain and describe the

15   hand gesture?

16   A.   When -- after he was leaving my residence after we had a

17   conversation, he walked down the stairs to go to his car and

18   turned and went like that (demonstrating).

19        THE COURT:  Would you hold your hand up?  I'm unable

20   to see it.

21   A.   (Demonstrating).

22        THE COURT:  All right.  And what did you understand

23   that to mean?

24   A.   A firearm, sir.

25        THE COURT:  And what about a firearm?
```

```
1    A.   I guess to bring it.
2              THE COURT:  All right.
3    BY MR. DOCOBO:
4    Q.   And when did that take place?
5    A.   That was well before either of the trips.  I don't
6    remember off the top of my head.  At least a couple of weeks
7    before the first trip.
8    Q.   Okay.  So it wasn't in relation to the March 12th trip
9    that he made this hand gesture.
10   A.   No, not that day, no.
11   Q.   Okay.  And it wasn't in relation to the April trip that
12   this hand gesture was made.
13   A.   No.
14   Q.   So the hand gesture was made at a time totally unrelated
15   to the criminal --
16   A.   It was several weeks before anything happened, yes.
17   Q.   Unrelated to the criminal activity in this particular
18   indictment.
19   A.   Yes.
20             MR. DOCOBO:  I have no further questions.
21             THE COURT:  Well, why did you bring a firearm with you
22   to the locations?
23   A.   Well, Your Honor, I would have left with them anyway.  I
24   never -- I never left the house without a firearm, Your Honor.
25             THE COURT:  Well, I'm having a little difficulty.
```

1   There's a hand gesture which you --

2   A.   I perceived it as to bring a weapon, yes.

3           THE COURT:  To bring a weapon when?

4   A.   During the transactions, Your Honor.

5           THE COURT:  All right.

6                       CROSS-EXAMINATION

7   BY MS. MAXWELL:

8   Q.   Good afternoon, Mr. Jacox.

9   A.   Good afternoon, ma'am.

10  Q.   Did Mr. Hernandez know that you always carried a weapon?

11  A.   I can't say that for sure, no, ma'am.

12  Q.   So when he makes the hand gesture to you, and just for the

13  record it's a thumb pointed up, the index finger pointed out?

14  A.   Yes, ma'am.

15  Q.   The three fingers -- the other three fingers bent?

16  A.   Yes, ma'am.

17  Q.   And your thumb making a movement up and down like the

18  trigger of a gun; is that correct?

19  A.   That's how I perceived it, yes, ma'am.

20  Q.   And what was that gesture in relation to?  You said it

21  happened a few weeks before the actual transport that you were

22  involved in, but was it in conjunction with conversation that

23  day about you helping transport?

24  A.   Yes, ma'am.

25  Q.   Okay.  Do you recall conversations that you had after you

1    were arrested with myself, the United States Attorney's Office,

2    and with several law enforcement agencies regarding how it is

3    that you got involved in this case?

4    A.   Yes, ma'am.

5    Q.   And you in fact stated that Mr. Shawn Hernandez in essence

6    begged you to become involved in this crime, that you really

7    didn't want to participate in it because you knew what the

8    consequences were going to be.  Is that correct?

9    A.   I wouldn't say begged, ma'am, but he asked me, yes.

10   Q.   You don't recall using the word "begged"?

11   A.   If I said that, then that's what I said, then that's what

12   it is.

13   Q.   Well, what is your belief?  Was he just casually saying,

14   Hey, if you want to, fine, if you don't want to, that's fine

15   too, or was he putting some pressure on you to become involved?

16   A.   He put some pressure on me.

17   Q.   Did you in fact bring your gun as armed -- excuse me.  Did

18   you bring your gun to these transports in case something went

19   wrong?

20   A.   Yes, ma'am.

21   Q.   To protect yourself and to protect Mr. Hernandez?

22   A.   Yes, ma'am.

23   Q.   Did you get paid for that?

24   A.   Yes, ma'am.

25   Q.   Who paid you?

1    A.    Mr. Hernandez.

2    Q.    Now, in the second load you mentioned that -- when counsel

3    asked you the question that you were involved in two loads from

4    Homestead to the Keys, but that's not exactly correct, right?

5    The first load that you were involved in, you didn't start in

6    Homestead.

7    A.    No, ma'am.

8    Q.    Isn't it a fact that the defendant picked up the drugs in

9    Homestead and then stopped by your house so that you would

10   assist him to finish the transportation down to the lower Keys?

11   A.    Yes, ma'am.

12   Q.    And where is it that you live?

13   A.    Big Pine Key, about mile marker 30.

14        MS. MAXWELL:  Your Honor, if I can just meet with

15   probation?  They were looking something up for me.

16     (Off-the-record discussion.)

17   BY MS. MAXWELL:

18   Q.    Do you recall on the first load that you were involved in,

19   which is actually the second load in this investigation, do you

20   recall when Mr. Hernandez showed up to your house?

21   A.    Well, he -- we met on the side of the road first, but went

22   to the house.  But yes, I remember.

23   Q.    And at that time Mr. Hernandez and yourself actually pried

24   open the toolbox that contained the drugs inside when

25   Mr. Hernandez was showing you what was inside there.

1    A.   We pried open the corner, yes, ma'am, because the other

2    corner was locked.

3    Q.   Okay.  And do you recall telling myself and the agents

4    during debriefings that it was discussed at that time that it

5    was a large amount of drugs and that a weapon was going to be

6    needed to provide protection?

7    A.   Yes, ma'am.

8    Q.   And that was a discussion that you had with Mr. Hernandez.

9    A.   Yes, ma'am.

10   Q.   Now, it wasn't you asking Mr. Hernandez for help, correct?

11   A.   No.

12   Q.   It was Mr. Hernandez asking you for help.

13   A.   Yes, ma'am.

14   Q.   Do you recall a letter that you wrote to the Court on

15   behalf of Mr. Hernandez?

16   A.   Yes, ma'am.

17   Q.   Okay.  I was just reviewing that letter today and I wanted

18   to ask you about a sentence that you wrote in it.

19   A.   Yes, ma'am.

20        MS. MAXWELL:  And Your Honor, this would be on the

21   3552 issues.  Since all the witnesses have taken the stand for

22   his character, there was one phrase here that kind of caught my

23   eye and I wanted to ask Mr. Jacox about it.

24   BY MS. MAXWELL:

25   Q.   You mentioned that, I can't help but feel deep in my heart

1   and soul that the Monroe County Sheriff's Department, the FBI,

2   and the DEA's office did not, quote, stumble on corruption, but

3   actually created it.

4   A.   Okay.

5   Q.   Do you recall that sentence?

6   A.   Yes, ma'am.

7   Q.   Okay.  Do you recall -- well, I guess what you mean by

8   that if I'm correct is that Mr. Hernandez would never have done

9   anything wrong at all, correct, that he was a law-abiding

10  citizen, somebody who would never break the law whatsoever but

11  for these wicked law enforcement agents trapping him, so to

12  speak.  That's what I get from that sentence.

13  A.   No, ma'am, it wasn't meant -- it wasn't meant in that way,

14  no, ma'am.

15  Q.   What do you mean by "created it"?

16  A.   Well, I was under the impression that the person that

17  Shawn got in contact was a CI, after I had found out the

18  information after being debriefed, and that's just the way that

19  I felt about it.  I felt that he had been entrapped.

20  Q.   Entrapped, okay.

21  A.   Yes, ma'am.

22  Q.   Well, there's a legal meaning to entrapped.  Meaning that

23  a person would never do it on their own accord but for the

24  government tricking them or trapping them or inducing them into

25  doing it.  Okay?

1    A.   Okay, yes, ma'am.

2    Q.   But you told us about criminal activity that this

3    defendant, Mr. Hernandez, was trying to engage you in other

4    than transporting drugs.  He was trying to get you, wasn't he,

5    to get involved in an IRS scam, wasn't he?

6    A.   Yes.

7    Q.   Yes.  In fact, he asked you, because there was a scam

8    going on in the Monroe County jail that you're aware of because

9    we've talked about it, where inmates are using fake names and

10   fake Social Security numbers to get tax return money, correct?

11   A.   Yes, he told me about it, yes, ma'am.

12   Q.   And he asked you to get involved in it as well up here in

13   Miami, correct?

14   A.   He said that was a possibility, yes, ma'am.

15   Q.   Are you aware that he was found, in his possession at the

16   time of his arrest, with two tax returns from inmates that were

17   fraudulent?

18   A.   No, ma'am.

19   Q.   Would your mind be changed on that creating a crime if you

20   knew that?

21   A.   Yes, ma'am.

22        (Off-the-record discussion.)

23            MR. DOCOBO:  Mr. Jacox --

24            MS. MAXWELL:  I'm not done.  Just one moment.

25            THE COURT:  I would like an explanation of the last

1   sentence in the paragraph that you referenced, to wit, There

2   were many different conditions by which we became involved in

3   all of this.

4       What does that mean, Mr. Jacox?

5   A.   Sir, just the fact that we were both probably not thinking

6   straight because of our financial situation.  That was one that

7   popped off in my head, Your Honor.  Desperate greed is what I'm

8   trying to get at, sir.

9       THE COURT:  All right.  Thank you.

10      MS. MAXWELL:  Your Honor, without my notes from the

11  debriefings, I don't have any further questions at this point.

12      THE COURT:  All right.  Thank you.

13      MS. MAXWELL:  Thank you.

14                  REDIRECT EXAMINATION

15  BY MR. DOCOBO:

16  Q.   Mr. Jacox, Mr. Hernandez never asked you to bring a gun,

17  did he?

18  A.   It wasn't openly discussed, no.

19  Q.   Okay.  Did he ever use the word "gun," that you should

20  bring your gun?  Did he ever say that to you expressly?

21  A.   No.

22  Q.   And your testimony here today is that he made a hand

23  gesture two weeks before the March transportation, correct?

24  A.   Yes.

25  Q.   And that was when you were discussing somehow making

1    additional money, correct?

2    A.    Yes.

3    Q.    And where were you when this hand gesture was made?

4    A.    On my porch.

5    Q.    And where was he?

6    A.    Leaving the porch, going around the corner to his vehicle.

7    Q.    Okay.  And that's -- and you had discussed the possibility

8    of doing this.

9    A.    Yes.

10   Q.    And was his back turned to you when he made this gesture?

11   A.    No, he was facing me.

12   Q.    I see.  Now, this particular gesture, I noticed that you

13   made a statement to the Court vis-a-vis your own sentencing.

14   Did you mention this gesture in your own statement to the Court

15   previously?

16   A.    No, I did not.

17   Q.    Did you mention this gesture to the agents during the

18   course of your debriefings?

19   A.    No, I did not.

20   Q.    Didn't they ask you to give a full account of

21   Mr. Hernandez -- you were preparing to testify against

22   Mr. Hernandez in the event he went to trial; isn't that

23   correct?

24   A.    Yes, sir.

25   Q.    And you were trial prepared for testimony against

```
 1    Mr. Hernandez, correct?

 2    A.    We went over some things, yes.

 3    Q.    You went over anticipated cross-examination, correct?

 4    A.    No, I don't recall that, no.

 5    Q.    You went through your proposed direct testimony, correct?

 6    A.    No, I don't remember it being -- being brought into all

 7    that, no, sir.

 8    Q.    But you were certainly asked about all the details of

 9    these particular events forming the basis of the indictment,

10    correct?

11    A.    Some details, yes.

12    Q.    They only asked you some details?

13    A.    Well, I don't know all what was involved in what I was

14    supposed to know as far as going to trial.

15    Q.    How long were you debriefed for?

16    A.    I don't remember, a couple of hours.

17    Q.    How many occasions?

18    A.    One or two.

19    Q.    And you never mentioned a hand gesture?

20    A.    No.

21    Q.    Are you sure about this hand gesture?

22    A.    Yes, sir.

23    Q.    Are you sure it wasn't this (demonstrating)?

24    A.    No.

25    Q.    You sure it wasn't in relation to money?
```

```
 1    A.    No, sir.

 2    Q.    So you're now sure that it was a gun.  That he was making

 3    reference to or --

 4    A.    This gesture (demonstrating).

 5    Q.    This gesture (demonstrating).

 6    A.    Yes, sir.

 7    Q.    Okay.  And you didn't necessarily -- well, you never

 8    discussed that with the agents, this particular hand gesture.

 9    The hand gesture took place two weeks before the first drug

10    run.

11          MS. MAXWELL:  Objection, asked and answered.

12    BY MR. DOCOBO:

13    Q.    Is it possible that the hand gesture --

14          THE COURT:  Overruled.

15    Q.    -- meant something other than bring a gun two weeks later

16    for a drug transaction of which you had not yet agreed to

17    participate in?

18    A.    It's possible, but that's not how I took it.

19    Q.    Okay.  But it's possible it meant something entirely

20    different, correct?

21    A.    That's --

22          MS. MAXWELL:  Objection, calls for speculation.

23          THE COURT:  Overruled.

24    BY MR. DOCOBO:

25    Q.    It's possible it meant something entirely different,
```

```
 1   correct?

 2   A.   It's possible.

 3   Q.   It could have been a gesture totally unrelated to bringing

 4   a gun in a drug transaction, correct?

 5   A.   It's possible.

 6   Q.   Now, from the known information that you have in your own

 7   mind, you are still confident that Mr. Hernandez never asked

 8   you or induced you or persuaded you in any way, shape, or form

 9   to bring a gun, correct?

10   A.   I don't remember him saying, John, bring your gun, if

11   that's what you mean.

12   Q.   Okay.  Because he never did say that, did he?

13   A.   I don't remember that, no.

14   Q.   Okay.  And you did talk about what your role would be,

15   correct?

16   A.   Yes.

17   Q.   And your role would be to be a trail car, correct?

18   A.   That's one way of looking at it, yes.

19   Q.   Well, that was the way you looked at it in your

20   post-arrest statement, correct?

21   A.   Yes.  I believe I used armored car service.

22   Q.   Correct.  That was your term, correct?

23   A.   That was how I perceived it, yes.

24   Q.   Okay.  And you were specifically asked during the course

25   of your debriefings whether Mr. Hernandez asked you to bring a
```

1   gun and you specifically told the agents that he never asked

2   you to bring a gun, correct?

3   A.   Yeah, I don't remember saying that, no.

4   Q.   Okay.  But you do remember being specifically asked the

5   same questions I asked you on direct, correct?

6   A.   Yes.

7   Q.   So in other words, the agent asked you whether or not

8   Hernandez asked you to bring a gun and you told the agent in

9   the debriefing sessions, no, he never asked me to bring a gun,

10  correct?

11  A.   I don't remember that, no.

12  Q.   Did you ever tell them that he asked you to bring a gun?

13  A.   No.

14  Q.   So your testimony today is consistent with your debriefing

15  sessions, correct?

16  A.   I believe so, yes.

17          MR. DOCOBO:  Nothing further.  Thank you.

18          MS. MAXWELL:  Recross, Your Honor?

19          THE COURT:  No, I don't allow recross, but I'm going

20  to ask some questions for which both of you may ask some

21  questions.

22          I'm a little unclear, Mr. Jacox.  You testified

23  earlier that there was this hand signal which you perceived or

24  understood to mean bring a gun --

25  A.   Yes, sir.

1    THE COURT:  -- during the transactions, as you

2    testified.

3    A.   That's how I perceived it, yes, Your Honor.

4    THE COURT:  You also made a statement that there was

5    one occasion when a box was pried open and you saw a large

6    quantity of drugs and there was a discussion about the need to

7    protect the drugs.  Is that correct?

8    A.   Yes, but I don't ever remember saying that I was going to

9    bring a gun or that a gun should be brought.

10   THE COURT:  Well, what was the discussion about

11   protect the drugs, to the best of your recollection?

12   A.   I don't remember, Your Honor.

13   THE COURT:  Then why do you say there was some

14   inference or suggestion that there was a firearm needed to

15   protect the drugs?  I don't -- I'm not understanding why you

16   would say that if you don't remember a discussion or gesture or

17   something.

18   A.   I remember the gesture, but I took it as a perception to

19   bring it, to bring a firearm, by the hand gesture that Shawn

20   made.

21   THE COURT:  Well, that was one incident you testified

22   about.

23   A.   Yes, sir.

24   THE COURT:  There was a second incident where the box

25   was pried open.

1    A.   Yes.

2         THE COURT:  There was a large quantity of drugs

3    observed and there was some statement that you made about, as a

4    result of that particular incident --

5    A.   Yes, sir.

6         THE COURT:  -- that there was a discussion or

7    otherwise about the need to protect the drugs.  And I inferred

8    from that that you were talking about a firearm to protect the

9    drugs.  Is that accurate or not?

10   A.   It's accurate, but I don't remember saying the word "gun"

11   or "firearm" in that conversation is what I'm saying.

12        THE COURT:  Then why did you think it was a discussion

13   about a firearm necessary to protect the drugs?

14   A.   Well, I don't remember saying that I was going to bring a

15   gun or a gun needed to be brought to protect the load is what

16   I'm saying, Your Honor.  I don't remember having that

17   conversation at that time with Mr. Hernandez.

18        THE COURT:  Well, you did tell us that there was a

19   discussion about protecting the drugs.

20   A.   Yes, but I don't remember in detail whether I said, Yes,

21   we need to bring a gun or I'm going to have a gun or I'm going

22   to bring it or not, the firearm was to be used.

23        THE COURT:  I was ready to stop except your last

24   statement created some more confusion.  I'm going to read it to

25   you.

1    A.    Okay.

2         THE COURT:  Yes, but I don't remember in detail

3    whether I said, Yes, we need to bring a gun or I'm going to

4    have a gun or I'm going to bring it or not, the firearm was to

5    be used.  What did the sentence "the firearm was to be used"

6    mean?

7    A.   Well, either bring it or shoot it.  If I was going to

8    bring a firearm or a firearm was to be used, I don't remember

9    having that conversation outright with Mr. Hernandez.

10        THE COURT:  All right.  Questions generated by the

11   Court's?  Government?

12        MS. MAXWELL:  Counsel is actually technically --

13   counsel is technically first.  I mean, I don't want to step on

14   his toes.

15        THE COURT:  I'm sure you don't, Ms. Maxwell.

16        Mr. Docobo?

17                    REDIRECT EXAMINATION

18   BY MR. DOCOBO:

19   Q.   The hand gesture two weeks prior to the incident, you

20   cannot testify under oath before this Court that that hand

21   gesture was in relation to the criminal activity.  That's

22   clear.  Correct?

23   A.   I took it as -- as to bring a gun with me at that time.

24   Q.   Okay.  At that time.

25   A.   Well, during the drug transactions.

```
1    Q.   Okay.  That's how you took it.

2    A.   Yes.

3    Q.   Okay.  But you don't know that that's how Shawn took it.

4    A.   I can't tell what he thought.

5    Q.   Okay.  And in any event, that hand gesture did not

6    persuade you or influence you in any way, shape, or form to

7    bring a gun, did it?

8    A.   I was going to bring it regardless.

9         MR. DOCOBO:  Thank you.  One more question.

10   BY MR. DOCOBO:

11   Q.   When you say, I was going to bring it regardless, that was

12   on your own accord, correct?

13   A.   Yes.

14        MR. DOCOBO:  Thank you.

15                    RECROSS-EXAMINATION

16   BY MS. MAXWELL:

17   Q.   When he made the hand gesture, were you talking about

18   hunting?

19   A.   No, ma'am.

20   Q.   Were you talking about going shooting at the range?

21   A.   No, ma'am.

22   Q.   Were you talking about shooting beer cans in the backyard?

23   A.   No, ma'am.

24   Q.   Were you -- did he make that hand gesture during a

25   conversation where he is pressuring you to become involved in
```

1  transporting drugs?

2  A.   Yes, ma'am.

3  Q.   Okay.  Before he made that hand gesture, did you tell him,

4  I'm going to bring a gun?

5  A.   I never said that, no.

6  Q.   Before he made the hand gesture, did you say, We should

7  bring a gun?

8  A.   I don't remember saying that, no, ma'am.

9  Q.   We need a gun?

10  A.   I never said that, no, ma'am.

11  Q.   So the first time the issue of a gun involved in the

12  transportation of drugs, the first time the mention --

13           MR. DOCOBO:  (Inaudible.)

14           THE COURT:  One moment.  I'm sorry, I didn't hear you,

15  Mr. Docobo.

16           MR. DOCOBO:  Objection, it misstates the former

17  evidence.  His former evidence is that it -- it misstates the

18  evidence.

19           THE COURT:  This is cross-examination.  Overruled.

20           MR. DOCOBO:  I understand that, but --

21           THE COURT:  Overruled.

22  BY MS. MAXWELL:

23  Q.   The first time mention of a gun, either verbally or by

24  hand signal, the first time it ever arose was when Shawn

25  Hernandez made that hand signal to you, correct?

1   A.   Yes, ma'am.

2   Q.   When you, the both of you pried open the toolbox, saw the

3   drugs, had the discussion about the large quantity of drugs and

4   the need to protect it, the hand gesture had already been made,

5   correct?

6   A.   Yes, ma'am.

7   Q.   So when you're talking about protecting something, how

8   else are you going to protect a drug deal if it's not a gun,

9   correct?

10  A.   Yes.

11  Q.   And therefore, isn't it a fact, sir, that it didn't need

12  to be stated because Mr. Hernandez had already shown you that

13  hand signal so you didn't need to say the gun?

14  A.   That's what I'm under the impression, yes.

15            MS. MAXWELL:  No further questions, Your Honor.

16            THE COURT:  All right.  Sir, you may step down.

17            All right.  Any additional evidence other than the

18  matters we've discussed?  Anything further from the defense?

19  Let me put it that way.  Any additional evidence?

20            MR. DOCOBO:  No, not -- no.

21            THE COURT:  Very well.  And the government would

22  desire an opportunity to present transcripts or something of

23  that sort; is that correct?

24            MS. MAXWELL:  Your Honor, in all honesty, I think that

25  Mr. Jacox's statement is sufficient.  If Your Honor does not

1    believe it's sufficient, I'm being very candid, then I can

2    supply all the statements from Mr. Hernandez himself, both post

3    arrest or during the actual debriefing -- incident.

4            THE COURT:  Well, if you have some additional

5    statements which bear on this issue, I would like to hear them

6    or see them.

7            MS. MAXWELL:  I do have additional things.

8            THE COURT:  All right.  I would like to view those

9    statements.  What I suggest is you submit the transcripts with

10   the appropriate language highlighted as soon as possible.  What

11   I would like to do is set this matter to continue at 3:30 p.m.

12   on Wednesday.  Is that a time that the parties are available?

13           MS. MAXWELL:  That is perfect for me, Your Honor.

14           THE COURT:  Mr. Docobo?

15           MR. DOCOBO:  Judge, may I be allowed to consult my

16   Blackberry?  Because I take the battery out when I come into

17   court.

18           THE COURT:  I didn't hear everything -- you said

19   something about a battery?

20           MR. DOCOBO:  I take the battery out of my Blackberry

21   when I come into court.  I was told that it might interfere

22   with the communications of the Court so that's why I do that.

23           THE COURT:  All right.  Why don't you do that.

24           MR. DOCOBO:  Judge, I don't need to consult.  If

25   that's a free time for you, I'll make it happen.  I'll just be

 1   here.

 2          THE COURT:  All right.  I'm sorry we have to continue

 3   this matter.  Sometimes when we don't abide by the rules for

 4   filing pleadings, it requires some inconvenience for the

 5   witnesses and parties.  And I'm sorry that we have to continue

 6   this matter, but we don't have any alternative.  This matter is

 7   continued to this coming Wednesday at 3:30 p.m.

 8          MS. MAXWELL:  Thank you, Your Honor.

 9          THE COURT:  At that time, I will entertain the

10   government's submissions and entertain argument regarding an

11   appropriate sentence and proceed with sentencing.

12          MS. MAXWELL:  Thank you.

13          THE COURT:  Thank you very much.  We are in recess.

14      (Proceedings concluded at 3:11 p.m.)

15                      *   *   *   *   *

16

17

18

19

20

21

22

23

24

25

1  UNITED STATES OF AMERICA                           )
                                                      )   ss:
2  SOUTHERN DISTRICT OF FLORIDA                       )

3

4                    C E R T I F I C A T E

5      I, Carly L. Horenkamp, Certified Shorthand

6  Reporter in and for the United States District Court for the

7  Southern District of Florida, do hereby certify that I was

8  present at and reported in machine shorthand the proceedings

9  had the 29th day of October, 2009, in the above-mentioned

10 court; and that the foregoing transcript is a true, correct,

11 and complete transcript of my stenographic notes.

12     I further certify that this transcript contains

13 pages 1 - 60.

14     IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15 Florida, this 15th day of May, 2010.

16

17

18                    s/ Carly Horenkamp

19                    Carly L. Horenkamp, RMR, CRR
                      Certified Shorthand Reporter

20

21

22

23

24

25