IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Case No. 09-20416-CR-DLG

UNITED STATES OF AMERICA,

                        Plaintiff,        NOVEMBER 4, 2009
                                          3:34 P.M.


          vs.


SHAWN M. HERNANDEZ,

                        Defendant.        PAGES 61 THROUGH 106
_____


VOLUME 2
TRANSCRIPT OF SENTENCING

BEFORE THE HONORABLE DONALD L. GRAHAM
UNITED STATES DISTRICT JUDGE


**APPEARANCES:**

FOR THE PLAINTIFF:    Ms. Cristina V. Maxwell, AUSA
                      UNITED STATES ATTORNEY'S OFFICE HIDTA
                      11200 NW 20th Street
                      Miami, Florida  33172


FOR THE DEFENDANT:    Mr. Richard D. Docobo, Esq.
                      ATTORNEY AT LAW
                      Suite 2803
                      80 S.W. 8th Street
                      Miami, Florida  33130


COURT REPORTER:       Carly L. Horenkamp, RMR, CRR
                      U.S. District Court
                      400 N. Miami Avenue, Room 13-4
                      Miami, Florida  33128
                      (305) 523-5138

1                    **I   N   D   E   X**

2    *Certificate* ------------------------------------------ 106

3

4                    **W   I   T   N   E   S   S**

5    ON BEHALF OF THE GOVERNMENT:                        PAGE
     JONATHAN JACOX
6    DIRECT EXAMINATION BY MS. MAXWELL                    71
     CROSS-EXAMINATION BY MR. DOCOBO                      76
7    REDIRECT EXAMINATION BY MS. MAXWELL                  85

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Open Court, 3:34 p.m.)

2             COURTROOM DEPUTY:  United States versus Shawn

3    Hernandez, 09-20416-Criminal-Graham.

4             THE COURT:  Appearances, please.

5             MS. MAXWELL:  Good afternoon, Your Honor, Cristina

6    Maxwell on behalf of the United States.  Sitting at counsel

7    table with me is Detective Lee Ann Holroyd from the Monroe

8    County Sheriff's Office.

9             THE COURT:  Good afternoon.

10            MR. DOCOBO:  Your Honor, good afternoon, Richard Docobo

11   on behalf of Shawn Hernandez, who is present --

12            THE COURT:  We're having a little difficulty hearing.

13   Use the microphones, counsel.

14            MR. DOCOBO:  I never get accused of talking too softly,

15   Your Honor.  Richard Docobo on behalf of Mr. Hernandez, along

16   with Maria Elena Perez.  And Shawn is present before the Court.

17            THE COURT:  Good afternoon.  We are here to continue

18   the sentencing in this cause.  The Court received a pleading

19   from the government as we discussed at our last hearing.  They

20   have provided transcripts with certain portions highlighted.

21   The Court has reviewed the transcripts and other submissions.  I

22   suppose I can give you all an opportunity to present some brief

23   argument regarding the submissions and then the Court is ready

24   to rule on the pending issues.

25            MR. DOCOBO:  Your Honor, I would ask the Court's

```
 1    indulgence.  There's been some recent conversations before

 2    today's hearing during the course of your last calendar call

 3    which I believe that my client should be made aware of prior to

 4    proceeding with his arguments, especially in relation to the

 5    safety valve.  May I have three to five minutes to discuss these

 6    new developments with Mr. Hernandez?

 7              THE COURT:  When you say "developments," I'm not sure

 8    what you're referencing.

 9              MR. DOCOBO:  Plea variations on plea discussions

10    between the government and the defense.

11              THE COURT:  All right.  I'll give you an opportunity to

12    have those discussions with your client.

13              MR. DOCOBO:  Thank you.

14              MS. MAXWELL:  Your Honor, may I approach to speak to

15    Clara for a moment?

16              THE COURT:  You may.

17              MS. MAXWELL:  Thank you.

18         (Off-the-record discussion.)

19              THE COURT:  Excuse me, counsel, but your voices are

20    coming over the --

21              MR. DOCOBO:  Oh, sorry about that, Your Honor.

22         (Off-the-record discussion.)

23              THE COURT:  Are we ready to proceed?

24              MR. DOCOBO:  We're ready to proceed.

25              THE COURT:  All right.  Yes, sir.
```

1          MR. DOCOBO:  Yes.  Can Your Honor hear me?

2          THE COURT:  Yes, I can.

3          MR. DOCOBO:  Your Honor, after discussions with the

4     government this afternoon, as well as discussions between

5     Ms. Perez and my client this afternoon, with the Court's

6     permission, Mr. Hernandez would ask to withdraw his objection

7     vis-a-vis the safety valve argument, which was partially

8     articulated the last time we convened, and he would forego that

9     argument at this particular point in time, with the Court's

10    permission.

11         THE COURT:  Well, there were a number of attendant

12    issues.

13         MR. DOCOBO:  Correct.

14         THE COURT:  When you say withdraw safety valve, are you

15    making reference to withdrawing the enhancement related to the

16    firearm or is that a -- do you perceive that as a different

17    issue?

18         MR. DOCOBO:  Well, that's a purely legal issue, Judge,

19    and I think that the Court came to the conclusion, and I don't

20    disagree, that the Eleventh Circuit has firmly ruled in the

21    Segarra case on that particular issue.  The Second Circuit has

22    taken a contrary position.  I don't want to withdraw that

23    specific argument because frankly I don't believe it's

24    necessarily a factual PSI argument.

25         THE COURT:  I've already ruled on that issue, though,

```
1    haven't I?
2              MR. DOCOBO:  Correct, correct.
3              THE COURT:  So why would you withdraw?
4              MR. DOCOBO:  I'm not.
5              THE COURT:  All right.  Then I'm not understanding you.
6              MR. DOCOBO:  Okay.  No, the safety -- this was --
7    perhaps Shawn should hear this also.  The safety valve argument
8    revolves around, in my view, a purely semantic legal argument.
9    If you look at the safety valve, 5C1.2 safety valve, what the
10   safety valve says is this: it's not available to a person who
11   either possesses a firearm and/or induces another to possess a
12   firearm.
13             He falls in a very curious factual scenario.  He never
14   particularly carried a firearm himself, so therefore there is no
15   possession.  I think the case law is pretty clear under Clavijo
16   that the possession made reference to was actual possession as
17   opposed to constructive possession.  So the question revolves
18   around the semantics of what is inducement.
19             THE COURT:  Well, not semantics.  It's just an issue.
20   The Court has to determine if the defendant induced another
21   based upon the evidence.
22             MR. DOCOBO:  Correct.
23             THE COURT:  And you are making a comment that you are
24   withdrawing that objection.  Is that correct or not?
25             MR. DOCOBO:  That is correct, Your Honor.
```

1          THE COURT:  All right.  Have you discussed that with

2     Mr. Hernandez?

3          MR. DOCOBO:  Yes, and there's a backdrop as to why and

4     it's a strategic reason as to why.  I think reasonable lawyers

5     could differ as to whether to pursue that particular point, but

6     we've chosen not to for a reason that may or may not be germane.

7     If Your Honor wants to colloquy my client or me on that, I'd be

8     more than willing to answer any questions.

9          THE COURT:  Well, you've announced that you desire to

10    withdraw the issue which relates to the enhancement of inducing

11    one to carry a firearm, which means that that enhancement would

12    apply, Mr. Hernandez, as set forth in the presentence report.

13    Have you discussed this issue with your attorney?

14          THE DEFENDANT:  Yes, sir.

15          THE COURT:  And do you agree that you are withdrawing

16    your objection to the enhancement related to inducing one to

17    carry a firearm?

18          THE DEFENDANT:  Yes, Your Honor.

19          THE COURT:  All right.  Do you have any questions on

20    that point?

21          THE DEFENDANT:  No, sir.

22          THE COURT:  Very well.

23          MR. DOCOBO:  Judge, I don't mean to split hairs, but

24    it's not really an enhancement, it's the withdrawal of the

25    ability to go below the guidelines.

1           THE COURT:  It enhances the sentence because he

2     receives a two-level -- is it two-level increase?  Let me take a

3     look so we can be precise.

4           MR. DOCOBO:  It's a two-level -- it's a two-level

5     decrease for safety valve which we would be foregoing under the

6     guidelines; and also, more importantly, is he would not be able

7     to go below the ten-year minimum mandatory for the drug

8     conspiracy count.

9           MS. MAXWELL:  Your Honor, I think I understand the

10    confusion here.  The Department of Probation has not asked for

11    an enhancement for recruiting anybody.  What they simply did was

12    they said that he was not eligible for the safety valve because

13    he induced somebody regarding the firearm issue.  The government

14    is not asking for Your Honor to increase his sentence by two

15    levels for recruiting, even though Your Honor could legally do

16    so, as we stated in our motion.  In our supplement that we just

17    filed, we informed the Court that Your Honor could do so, but

18    probation did not ask for it and we are not asking for it.  We

19    are simply saying --

20          THE COURT:  This simply makes him ineligible for the

21    safety valve.

22          MS. MAXWELL:  For the safety valve.

23          THE COURT:  All right.  I understand.  Are there other

24    objections to the presentence report?

25          MR. DOCOBO:  The other objections have been ruled upon.

1    THE COURT:  In addition to those that I have ruled

2    upon?  I'm just asking for --

3    MR. DOCOBO:  There is nothing else the Court need

4    consider.

5    THE COURT:  Very well.  The Court adopts the

6    presentence report as the findings of fact and conclusions of

7    law in this cause.

8    May I have the probation officer announce her

9    appearance and give us the guideline ranges and resultant

10   sentences?

11   PROBATION OFFICER:  Good afternoon.  Clara Lyons with

12   probation.  Has acceptance been clarified?

13   MS. MAXWELL:  Yes.

14   THE COURT:  Yes.

15   MS. MAXWELL:  It should be three levels.

16   PROBATION OFFICER:  Three levels?  Okay.  With three

17   points for acceptance of responsibility, the total offense level

18   is 33.  That results in an advisory guideline imprisonment range

19   of 135 months to 168 months plus 60 months consecutive.  All

20   other provisions remain unchanged except the lower end of the

21   fine is now $17,500.

22   THE COURT:  All right.

23   MR. DOCOBO:  Judge, I missed that, is that a level 33?

24   THE COURT:  33, correct.

25   MR. DOCOBO:  Plus the 60, obviously.

```
 1          THE COURT:  33, 135 to 168, with a consecutive 60-month
 2   sentence.
 3          MR. DOCOBO:  Yes, Your Honor.
 4          THE COURT:  All right.  That being the case, the Court
 5   will now entertain argument regarding an appropriate sentence.
 6   First we will hear from the government, followed by the defense.
 7          MS. MAXWELL:  Can Your Honor indulge me for one more
 8   minute to check on a stipulation?  If not, I was going to --
 9          THE COURT:  All right.
10      (Off-the-record discussion.)
11          MS. MAXWELL:  Your Honor, I believe at this point Your
12   Honor is going to be presented with 3553 arguments.  And Your
13   Honor heard from several family members and friends regarding
14   the defendant's character.  Last week I presented Mr. Jacox, who
15   is sitting here in court today, regarding some testimony that he
16   stated regarding the defendant's attempt to induce Mr. Jacox to
17   get involved in a tax fraud scheme.  After reviewing the agent's
18   notes in regard to the gun issue, I came across another issue
19   that I thought was relevant for the Court to hear regarding
20   alleged prior drug sales that the defendant may have been
21   involved in.  I would like to either call the agent or
22   Mr. Jacox, who the information came from, to ask the questions
23   regarding that drug sale that Mr. Hernandez was allegedly
24   involved in.
25          THE COURT:  All right.  Any objection?
```

```
 1          MR. DOCOBO:  I object to the conclusion, but I can't
 2   object to them calling the witness.
 3          THE COURT:  All right.  Please call your witness.
 4          MS. MAXWELL:  Mr. Jacox, if you could please take the
 5   stand.
 6             JONATHAN JACOX, GOVERNMENT WITNESS, SWORN
 7                       DIRECT EXAMINATION
 8   BY MS. MAXWELL:
 9   Q.  Mr. Jacox, I want to just ask you briefly about a few things
10   that you mentioned during debriefings after your arrest.  Do you
11   recall talking to the agents regarding some small amount drug
12   sales that Mr. Hernandez was involved in?
13   A.  Yes, ma'am.
14   Q.  Can you tell the Court -- well, do you remember those
15   conversations with the agents?
16   A.  Not in particular, no, ma'am, I don't.
17   Q.  Do you recall talking to the agents about drug sales that
18   Mr. Hernandez was involved in involving eight balls of cocaine?
19          MR. DOCOBO:  Objection, leading.
20          THE COURT:  Sustained.
21   BY MS. MAXWELL:
22   Q.  Do you recall any conversations with agents regarding drug
23   sales that Mr. Hernandez may have been involved in?
24   A.  In my debriefing, yes, ma'am.
25   Q.  Okay.  Tell the Court what you know about Mr. Hernandez and
```

1    possible prior drug sales?

2    A.  I believe that the conversation that I remember that you're

3    referring to, we were getting ready to debrief and you said that

4    I had to reach into my past in case that -- in case Shawn's

5    attorney tried to bring it up in the courtroom.  And the thing

6    that I think that I remember that you're referring to is that I

7    had asked Shawn for an eight ball of cocaine and that he said

8    that it was in the truck when we used to work for the City.

9    Q.  Can you elaborate on that a little bit?

10   A.  That I had asked for Shawn for cocaine.  He told me where to

11   find it.

12   Q.  And whose cocaine -- well, where was that cocaine located?

13   A.  It was in a truck parked in the City parking lot.

14   Q.  And whose truck was that?

15   A.  The City's.

16   Q.  And who was in possession of that truck at the time?

17   A.  Nobody.  It was empty.

18   Q.  How did Mr. Hernandez know the cocaine was in that truck?

19   A.  He told me where to find it.  He said it was in a paper bag

20   in the ashtray.

21   Q.  Did you believe that it belonged to him?

22   A.  He told me where to find it.

23   Q.  Why did you go to him for cocaine?

24   A.  I knew he had had it.

25   Q.  Why did you know that he had it?

1    A.  He was dealing with somebody who I thought that was dealing

2    cocaine.

3    Q.  Okay.  Mr. Jacox, do you feel reluctant on the stand talking

4    about your best friend?

5    A.  A little bit, yes.

6    Q.  Okay.  And why is that?  Explain to the Court.

7    A.  Well, he's -- he's my best friend and he's more like a

8    brother to me.  It's just hard for me to -- to throw him under

9    the bus, so to speak.

10   Q.  Okay.  I'm not asking you to throw anybody under the bus.

11   I'm asking you to tell the truth.

12   A.  Yes, ma'am.

13   Q.  Do you understand the distinction?

14   A.  Yes, ma'am.

15   Q.  And do you realize that you are under oath?

16   A.  Yes, I understand.

17   Q.  Okay.  Do you recall a conversation with agents where you

18   told the agents that in 1996 or 1997 Mr. Hernandez was selling

19   eight balls of cocaine?

20           MR. DOCOBO:  Objection, leading.

21           THE COURT:  Sustained.

22   BY MS. MAXWELL:

23   Q.  Do you recall a conversation that you had with the agents

24   regarding specific amounts of cocaine?

25   A.  I remember mentioning an eight ball, yes, ma'am.

1    Q.  Do you recall the conversation regarding a stolen car being

2    ditched in Hialeah?

3    A.  Yes, ma'am.

4    Q.  Tell the Court about that conversation.

5    A.  It was a BMW vehicle that used to belong to his

6    ex-girlfriend.

7    Q.  And what happened with that car?

8    A.  He picked it up, I followed him, we dropped it off in

9    Hialeah.

10   Q.  What was the purpose of doing that?

11   A.  To get the car stripped for parts.

12   Q.  How do you know that the purpose of leaving the car in

13   Hialeah was to be stripped for parts?

14   A.  Well, it was left because the person that was -- we were

15   supposed to drop it off to said he was no longer interested in

16   it, so we left it.

17   Q.  Whose car did it belong to?

18   A.  I don't remember her name.  One of his ex-girlfriends.

19   Q.  You mentioned that that BMW belonged to an ex-girlfriend of

20   Mr. Hernandez.  Did he have that car with her permission?

21   A.  Not that I believe so, no, ma'am.

22   Q.  Why do you believe not so?

23   A.  Because we picked it up from underneath a condo --

24   condominium complex.

25   Q.  What did he tell you about it while this was going on?

```
 1    A.  I don't -- that we were going to take it to Miami and drop
 2    it off, to Hialeah.
 3    Q.  So why is it that you believe that he did not have
 4    permission to have his ex-girlfriend's car?
 5    A.  I don't remember what I talked to in detail, ma'am.  It's
 6    been some -- I'm not trying to lie or perjure myself on the
 7    stand.  You have the liberty of whatever documents that you
 8    have.  I don't have that liberty.
 9    Q.  When you say that it was going to be stripped for parts, how
10    do you know that it was going to be stripped for parts?
11    A.  I just speculate.  That's what the person did in Hialeah.
12    Q.  How do you know that that's what the person did in Hialeah?
13    A.  That's what Mr. Hernandez told me.
14    Q.  Do you recall using the word, Mr. Hernandez took it for a
15    joy ride?
16    A.  Yes, ma'am.
17    Q.  Okay.  What does that mean?
18    A.  Well, taking -- took it to Miami -- taking it to Miami was
19    the joy ride, but that's the purpose that we dropped the car off
20    for.
21    Q.  What does it mean to take it for a joy ride?
22    A.  Take it, use it, and drop it off.
23    Q.  Did Mr. Hernandez tell you at the time that he was going to
24    have the parts stripped out of it?
25    A.  No, ma'am, not that I remember.
```

1          MS. MAXWELL:  Your Honor, I don't have any more

2    questions of this witness.

3          THE COURT:  All right.  Cross-examination.

4          MR. DOCOBO:  May it please the Court.

5                         CROSS-EXAMINATION

6    BY MR. DOCOBO:

7    Q.   The ex-girlfriend's name was Alice?

8    A.   I believe that's what it is, yes, sir.

9    Q.   And this is a BMW, correct?

10   A.   Yes, sir.

11   Q.   Okay.  Now, you talked about speculation that the car was

12   going to be stripped.  The car was never stripped, was it?

13   A.   No, sir, it was returned to the owner.

14   Q.   Alice.

15   A.   Yes, sir.

16   Q.   And she drove it home.

17   A.   No, I think a towing company picked it up and brought it

18   back to her, if I remember correctly.

19   Q.   The bottom line is this: there was no actual criminality

20   involved.  Correct?

21   A.   Other than a joy ride, I guess.

22   Q.   Well, the joy riding, he was driving his girlfriend's car

23   from Key West to Hialeah, correct?

24   A.   Yes, sir.

25   Q.   Okay.  And you were in the car, correct?

```
 1   A.  No, sir, I was following in my own vehicle.

 2   Q.  Okay.  And in your mind the car was going to be stripped,

 3   correct?

 4   A.  I thought so, yes.

 5   Q.  But he never told you it was going to be stripped, correct?

 6   A.  No.

 7   Q.  The car was driven to Hialeah, correct?

 8   A.  Yes, sir.

 9   Q.  It's brought to a condominium, correct?

10   A.  It was brought somewhere, yes.

11   Q.  Okay.  It was brought to the parking lot of a condominium

12   where another one of his friends happened to live, correct?

13   A.  Yes, sir.

14   Q.  And eventually Alice came and picked up the car and drove it

15   home, correct?

16   A.  I was under the -- somehow it got back to her.  I don't

17   remember the details of it.

18   Q.  Okay.  Intact, unstripped, unharmed, correct?

19   A.  Yes, sir.

20   Q.  Okay.  So whatever you told the agents about criminality

21   vis-a-vis the BMW is false because there was no actual

22   criminality, was there?

23        MS. MAXWELL:  Objection, Your Honor, calls for a legal

24   conclusion.

25        THE COURT:  Sustained.
```

1    BY MR. DOCOBO:

2    Q.  There was no actual criminality involved, correct?

3          MS. MAXWELL:  Same objection to the same question.

4          THE COURT:  Sustained.

5    BY MR. DOCOBO:

6    Q.  Any criminality was merely in your mind, correct?

7          MS. MAXWELL:  Objection.

8          THE COURT:  No.

9          MS. MAXWELL:  Form of the question.

10         THE COURT:  You can ask him what occurred.  I'll make a

11   decision as to whether there was a criminal act or not.  You

12   can't ask him to say it was a crime.

13   BY MR. DOCOBO:

14   Q.  The only person that was thinking about a crime was you,

15   correct?

16         MS. MAXWELL:  Objection, Your Honor, form of the

17   question and relevance.

18         THE COURT:  Sustained.

19   BY MR. DOCOBO:

20   Q.  Now, in relation to -- you said that there was a car that

21   you took drugs from in the Key West City pound; is that correct?

22   A.  No, sir, it was a City vehicle where I worked.  It was a

23   pickup truck.

24   Q.  I see.  So it was a -- where did you work at the time?

25   A.  I worked with Shawn at the City at the parking lot.

```
 1    Q.   And doing what?

 2    A.   Department of Transportation, taking tickets, sweeping up,

 3    cleaning.

 4    Q.   How long ago was this?

 5    A.   1997, '98 maybe.

 6    Q.   Was that before or after you went into the service?

 7    A.   That was after, sir.

 8    Q.   I see.  So it was after the service you went to work at Key

 9    West.  And you claim that he told you there was drugs in a

10    certain car, correct?

11    A.   Yes, sir.

12    Q.   But you're the one that retrieved the drugs, correct?

13    A.   Yes, sir.

14    Q.   He never gave you the drugs, correct?

15    A.   No, sir.

16    Q.   As a matter of fact, he never possessed those particular

17    drugs, to the best of your knowledge, did he?

18    A.   Not to my knowledge, no, sir.

19    Q.   And it wasn't his car, it wasn't his vehicle, was it?

20    A.   No, sir.

21    Q.   He didn't help you sell the drugs, did he?

22    A.   No, sir.

23    Q.   You're the one that got rid of the drugs, right?

24    A.   For personal consumption, yes.

25    Q.   Oh, you consumed --
```

```
 1    A.  Yes, sir.

 2    Q.  -- an eight ball of cocaine?

 3    A.  Well, we would sell a little bit and use the rest.

 4    Q.  You would sell a little bit and use the rest.

 5    A.  Yes, sir.

 6    Q.  Okay.  Not Shawn.  Because you were addicted to cocaine at

 7    that time, correct?

 8    A.  Yes, sir.

 9    Q.  Not Shawn, correct?

10    A.  No, sir.

11    Q.  And you never saw him sell cocaine, you never heard about

12    him selling cocaine.  You're under oath, sir.

13    A.  Yes, sir, I understand.

14    Q.  So the answer is no, you never saw him sell cocaine, did

15    you?

16    A.  No, sir, I did not.

17    Q.  And you had a cocaine habit and you're the one that needed

18    the cocaine because you were selling it for your own habit,

19    correct?

20    A.  Yes, sir.

21    Q.  Now, you're expecting a further Rule 35, are you not?

22    A.  Sir?

23    Q.  You received a sentence of seven years in this case, didn't

24    you?

25    A.  Yes, sir.
```

```
 1   Q.  And you received a sentence of seven years -- you were

 2   looking at 15 minimum mandatory, correct?

 3   A.  I was, yes, sir.

 4   Q.  And your ultimate sentence is seven years.  And the only

 5   thing that you did was agree to testify against your best

 6   friend, correct?

 7   A.  Yes, sir.

 8   Q.  You didn't give them any other useful information, did you?

 9           MS. MAXWELL:  Objection, Your Honor, relevance.

10           THE COURT:  Sustained.

11   BY MR. DOCOBO:

12   Q.  You lied to them, didn't you?

13   A.  Sir?

14   Q.  Didn't you lie to them?

15   A.  Not to my knowledge.

16   Q.  You lied to them about the BMW, didn't you?

17   A.  How did I lie?

18   Q.  Well, did you tell them that there was no criminality

19   involved with the BMW, that the car was not stripped and that

20   Shawn did nothing wrong?  Did you tell them that?

21   A.  I thought it was going to be stripped, but it wound up just

22   getting dropped off, yes.

23   Q.  You thought it was going to be stripped but you told them

24   that it was stripped, correct?

25   A.  No, I never said it was stripped.
```

1    Q.  You never told them that?

2    A.  I don't remember saying that, yeah, the car was stripped

3    down to nothing.

4    Q.  So if the government makes a representation that you told

5    them that the car was stripped, they're mistaken, correct,

6    because you never said that?

7    A.  I don't remember saying that, no, sir.

8    Q.  Well, could you have said that to try to embellish your own

9    value to the government?

10   A.  No, I don't think I would have done that, no, sir.

11   Q.  But you could have, correct?

12   A.  It's possible.

13   Q.  It's possible that you would have embellished the story

14   about the drugs at the pound also, correct?

15   A.  To -- no, not -- to the best of my ability, what I said is

16   what happened.

17   Q.  Well, they made a representation that you told them that

18   Shawn Hernandez had personally sold drugs in your presence.

19   That's what they're claiming.

20          MS. MAXWELL:  Objection to the form of the question.

21   Relevance.

22          THE COURT:  Rephrase your question.

23   BY MR. DOCOBO:

24   Q.  You heard the government's representation that you had told

25   them that you witnessed Shawn Hernandez sell drugs, correct?

1          MS. MAXWELL:  Objection, Your Honor, misstates the

2     question.

3          THE COURT:  Overruled.  Overruled.

4     BY MR. DOCOBO:

5     Q.  Did you hear the government make a representation in this

6     court in your presence that Shawn Hernandez -- you told them

7     that Shawn Hernandez had sold drugs in your presence?

8     A.  That's not what I remembered.  I didn't say sell drugs in

9     my --

10    Q.  What did they say?

11    A.  I don't remember what they said.  You'd have to remind me.

12    Q.  Okay.  But the bottom line is Shawn Hernandez never sold

13    drugs in your presence, did he?

14    A.  Not to the best of my knowledge, no.

15    Q.  Okay.  So if you told that to the government, that was an

16    untruth, correct?

17    A.  Yes, sir.

18    Q.  And Shawn Hernandez never had anything to do with stripping

19    a BMW, did he?

20    A.  Not personally, no.

21    Q.  So if you told the government that Shawn Hernandez was

22    involved in some sort of fraud or stripping or stealing parts

23    from a BMW, either they're mistaken or you lied, correct?

24    Either they're mistaken or you lied, correct?

25         MS. MAXWELL:  Objection to the form of the question,

1    Your Honor.  Objection.

2              THE COURT:  Sustained.

3    Q.  Did you lie or are they mistaken?

4              MS. MAXWELL:  Objection to the same question.

5              THE COURT:  Sustained.

6    BY MR. DOCOBO:

7    Q.  Why did you lie to the government?

8              MS. MAXWELL:  Objection to the form of the question,

9    Your Honor.

10             THE COURT:  You can ask did he, not why did --

11   BY MR. DOCOBO:

12   Q.  Did you lie to the government?

13   A.  Not knowingly, no.

14   Q.  All right.  Not knowingly, no.

15             MR. JACOX:  Okay.  Your Honor, could I speak freely for

16   a minute?

17             THE COURT:  Yes, sir.

18   A.  I've been -- in the last six months I've had my life turned

19   upside down, I've been locked up, I haven't eaten a good meal in

20   six months, I haven't slept well in six months.  I've been torn

21   from my family.  I sat in a freezing cold cell.  And you're

22   asking me to remember stuff that I told the government six to

23   eight months ago when it's all printed out on hard copy and

24   audio disk there.  I don't remember what I said to her.

25   Q.  Okay.  So in conclusion, your testimony has no value, does

1    it?

2    A.  That's your opinion.

3         MR. DOCOBO:  May I have one minute, Your Honor?

4         (Off-the-record discussion.)

5         MR. DOCOBO:  I have nothing further.

6                        REDIRECT EXAMINATION

7    BY MS. MAXWELL:

8    Q.  Counsel asked you whether the defendant ever sold drugs in

9    your presence.  You said no.

10   A.  I don't remember.  I don't remember if he ever did it in

11   front of me or not.

12   Q.  Did you ever have discussions with him regarding him selling

13   drugs?

14   A.  I don't remember, ma'am.

15   Q.  Is it your recollection that he did sell drugs or not?  What

16   is your recollection?  Did Shawn Hernandez sell drugs or not?

17        MR. DOCOBO:  Judge, how could he have a recollection of

18   something he never observed?  Objection.  Outside the scope of

19   his knowledge.

20        THE COURT:  Overruled.

21   BY MS. MAXWELL:

22   Q.  What is your recollection, did Shawn Hernandez sell drugs or

23   not?

24   A.  I don't remember him ever selling drugs, no.

25   Q.  Why then did you go to him for cocaine?  If you don't

1   remember him ever selling drugs, why would you walk up to

2   somebody who presumably has never sold drugs before and ask him

3   for cocaine?

4           THE COURT:  What does that have to do with selling

5   drugs?  Because you ask someone, that doesn't mean you're

6   selling them, so the whole question doesn't make sense.

7           MS. MAXWELL:  Your Honor, the government's position is

8   that if you go to somebody for drugs, they are either going to

9   give you those drugs free or they are going to give you those

10   drugs for a price.  And I'm trying to --

11           THE COURT:  All right.  You excluded one possibility in

12   the question, and that is free.

13           MS. MAXWELL:  I'm trying to elaborate why it is that he

14   said certain things.  I will have the detective on the stand

15   afterwards.

16   BY MS. MAXWELL:

17   Q.  But why is it that you went to Shawn Hernandez for drugs?

18   A.  I thought he would -- knew where to find it.

19   Q.  And why did you think that he would know where to find them?

20   A.  Because of the people that we were hanging around with at

21   the time.

22   Q.  Okay.  When he told you that the drugs were in the back of

23   the car, did he indicate to you who the drugs belonged to?

24   A.  No, ma'am.

25   Q.  Did he ask you -- did he tell you that you needed to pay

1   somebody for those?

2   A.   No, ma'am, it was never brought up.  He said it was in a

3   brown paper bag in the ashtray.

4   Q.   Okay.  Did you ever use drugs with him?

5   A.   No, ma'am, or not -- not cocaine.

6             MS. MAXWELL:  I have no further questions of this

7   witness, Your Honor.

8             THE COURT:  All right.  You may step down, sir.

9             MR. JACOX:  Thank you.

10            THE COURT:  Any additional evidence?

11            MS. MAXWELL:  Yes, Your Honor, I would call Detective

12  Lee Ann Holroyd from the Monroe County Sheriff's Office.

13            THE COURT:  Are you intending to call her to impeach

14  your witness?

15            MS. MAXWELL:  Yes, Your Honor.

16            THE COURT:  Well, what good does that do for your case?

17  In other words, she's going to say your witness is a liar.  All

18  right?  So what --

19            MS. MAXWELL:  I can proffer the evidence, Your Honor.

20            THE COURT:  I guess my point is, what am I left with?

21  If she's going to say your witness is a liar, then it means I

22  shouldn't consider that testimony, correct?

23            MS. MAXWELL:  I think it's just a credibility decision

24  for Your Honor to make.

25            THE COURT:  But I'm not going to listen to her say he's

1    a liar and then believe what he said the first time, if that's
2    what you're trying to do.  In other words, I don't understand
3    why you --
4              MS. MAXWELL:  Okay, Your Honor, then I -- I understand
5    Your Honor's position and I won't put the witness on.  I
6    understand Your Honor's position.
7              THE COURT:  I'm just explaining to you --
8              MS. MAXWELL:  I understand.
9              THE COURT:  -- calling someone to make your witness a
10   liar doesn't help me decide the factual issues.
11             MS. MAXWELL:  I understand, Your Honor.
12             THE COURT:  All right.  Any additional evidence?
13             MS. MAXWELL:  No, Your Honor.
14             THE COURT:  Defense?
15             MR. DOCOBO:  Judge, I have no witnesses, just brief
16   allocution.
17             THE COURT:  All right.  Sir, you may.
18             MR. DOCOBO:  May Shawn very briefly speak from here?
19             THE COURT:  Absolutely.
20             MR. DOCOBO:  Thank you.
21             THE DEFENDANT:  I don't even know where to begin.  Your
22   Honor, I just would like to apologize to yourself, the
23   prosecutor, the federal government, everybody, Monroe County, my
24   family for making one bad decision.  This has definitely been
25   the hardest thing I've ever had to endure in my life and I'm

1    pretty sure the same goes for my family as well.  And I don't

2    know how things turned around so quick to put myself in this

3    situation, and I apologize.  Thank you.

4         THE COURT:  All right.  Thank you very much, sir.

5         Yes, sir.

6         MR. DOCOBO:  Your Honor, the only thing I could

7    possibly ask for from the Court under 3553 is a reduction of 15

8    months, if Your Honor is inclined to give low end of the

9    guidelines.  We have a range of 135 to 168 months and 60 months

10   consecutive to that under the 924(c).  I would respectfully ask

11   the Court to make a one-level reduction to a level 32 and an

12   additional one month under 3553, which would still leave him

13   with a 15-year sentence, 120 months, followed by 60 months.  The

14   disparity in this particular case of sentences is huge.  It's

15   the vagaries of the system that we have chosen to participate in

16   and it's the law that Congress has set forth.  But I would ask

17   the Court --

18        THE COURT:  When you say disparity is huge, disparity

19   with regard to what?

20        MR. DOCOBO:  Between Mr. Jacox's sentence and

21   Mr. Hernandez's sentence.

22        THE COURT:  All right.

23        MR. DOCOBO:  And I agree that Mr. Hernandez's sentence,

24   even in a perfect world, based on the -- I can't get into their

25   minds, I don't know who was more culpable, I don't know who did

1   what in the past, and I'm not going to be so pretentious to try

2   to draw those kind of conclusions.  But based on the facts of

3   this case, Mr. Hernandez deserves a larger sentence than

4   Mr. Jacox does in a vacuum.  He was more involved,

5   unquestionably.  He made more trips.  And the actual quantity of

6   drugs that he was involved in was higher as a result of taking

7   more trips.

8          THE COURT:  All right.  I don't want to mix up the

9   parties.  Can you tell me who specifically you're referring to?

10          MR. DOCOBO:  Mr. Jacox is the codefendant in this case.

11   His sentence was seven years.  Mr. Jacox did not take as many

12   trips.  The seminal source of the case was Mr. Hernandez.

13          THE COURT:  Correct.

14          MR. DOCOBO:  Mr. Hernandez became involved in this

15   activity through a lifelong friend who was also an inmate that

16   Mr. Hernandez was in charge of, if you will, at a particular

17   point in time.  I briefly alighted upon these facts earlier.

18   The CI is a gentleman named George who Mr. Hernandez knew from

19   Key West.  This is obviously a small community.  They all grew

20   up together, went to the same high school, these kinds of

21   things.  George eventually became an inmate.  We can agree to

22   disagree as to who originally came up with the idea of

23   transporting drugs, but nevertheless, Mr. Hernandez did get

24   involved in this transportation of drugs which was an undercover

25   sting.

 1          The original plan was for one kilo, which Mr. Hernandez
 2   did deliver from Homestead to Key West.  The government kept
 3   going with Mr. Hernandez.  It greatly elevated the relevant
 4   conduct, but under the applicable case law, this is something
 5   that they could do.  Sentencing entrapment vis-a-vis the
 6   guidelines doesn't really exist in the Eleventh Circuit, but it
 7   is something the Court might take into consideration under 3553.
 8   In other words, it's the vagaries of the law enforcement system.
 9   He could have been arrested after the first trip.  If he was
10   arrested after the first trip, he'd have been looking at a
11   five-year minimum mandatory with a five-year consecutive on the
12   924(c).
13          A word about acceptance of responsibility also.  I
14   think there's super acceptance of responsibility in this
15   particular case.  I had urged my client to go to trial.  I
16   didn't see a great advantage --
17          THE COURT:  All right.  You know, Mr. Docobo --
18          MR. DOCOBO:  Yes.
19          THE COURT:  -- you've said that several times, but I
20   want you to know that's of no consequence.
21          MR. DOCOBO:  I understand.
22          THE COURT:  The case is Mr. Hernandez's case.  It is
23   not your case and what you think you should do.  Frankly, as I
24   look at the evidence, he probably made a good decision, but
25   that's neither here nor there.  So to keep arguing that you

1   wanted to go to trial is actually disturbing because you're

2   arguing a position that your client obviously didn't embrace and

3   you represent him and his interests.

4           MR. DOCOBO:  I'm just saying that in a conclusory

5   fashion, that the case was a reverse sting, it involved

6   confidential informants and undercover officers, he was not the

7   source of the cocaine, and he was not the source of the idea for

8   transporting.  So I only urge that as a conclusion, and I'm sure

9   the Court's aware of the facts that I won't even indulge that

10  particular issue in any further detail.

11          My point, my main argument is the disparity of the

12  sentences.  That's my main argument in this particular case.

13  Your Honor has heard the facts.  Your Honor is aware of the

14  evidence.  Your Honor is aware of Mr. Hernandez's background

15  based on the presentence investigation report.  I would

16  hopefully urge that the Court not take into consideration the

17  testimony of Mr. Jacox today.  I don't believe -- I would argue

18  that it does not rise to the level of veracity that should be

19  taken into consideration for the purposes of sentencing.  I

20  would urge that the Court merely reduce -- from the low end of

21  his applicable guideline range, make a reduction of 15 months

22  under 3553.

23          THE COURT:  Ordinarily I give the defense the last word

24  in sentencing proceedings and I will give you the last word.  I

25  would, however, like to hear the government's position with

1   regard to this sentencing disparity issue and what occasioned

2   it.  Frankly, of any argument I've heard, that's the only one I

3   would consider.  But I do want to give the government an

4   opportunity to state your position on that issue, and then if

5   desired Mr. Docobo can respond.

6            MS. MAXWELL:  Thank you, Your Honor.  Your Honor, the

7   difference between these two defendants starts from the very,

8   very beginning, and I think that the difference between the two

9   of them merits the sentencing disparity.  From the moment that

10  these two individuals got arrested, it was Mr. Jacox who

11  immediately admitted to his involvement in the case.  From the

12  moment he was arrested and the handcuffs were put on his hands,

13  he began to tell the agents of his involvement.  I'm not talking

14  about what he said about Mr. Hernandez, what Mr. Jacox said

15  about himself, which is what counts for acceptance of

16  responsible and the disparity that we end up with today based on

17  a 5K.  Immediately he told --

18           THE COURT:  So really the disparity is because of his

19  substantial cooperation, as deemed by the government, receiving

20  a 5K motion.

21           MS. MAXWELL:  That's what ended up in the disparity.

22  And that he qualified for a safety valve.

23           THE COURT:  And what was his original guideline range,

24  if you recall, without regard to the 5K, of course?

25           MS. MAXWELL:  I don't recall, but I think we could

```
 1    quickly get to it.

 2              THE COURT:  Does the probation office have a

 3    recollection on that issue?

 4              PROBATION OFFICER:  I don't recall, but I do recall he

 5    did not qualify for safety valve.

 6              MS. MAXWELL:  Correct.  He got the safety valve -- he

 7    was able to come below the minimum mandatory because he got the

 8    5K.  So he was not subject -- I misspoke.  He was not subject to

 9    the minimum mandatory because he received the 5K.  Additionally,

10    he did not get -- he was not enhanced by probation for abuse of

11    trust.  Probation --

12              THE COURT:  You shouldn't say "by probation."  The

13    Court determined --

14              MS. MAXWELL:  By Your Honor.  It wasn't recommended.

15    I'm sorry.

16              THE COURT:  Yes.

17              MS. MAXWELL:  It wasn't recommended by probation for

18    abuse of trust.  They had actually recommended something

19    different, which was special skill, which Your Honor did not

20    apply in that case.  The government stood mute.  Because I had a

21    plea agreement with the defendant which I felt was -- I kind of

22    felt it was not ethical for me to get on that bandwagon after I

23    had entered into a plea agreement where that was not taken into

24    consideration by either party.  So I explained to the Court that

25    on an enhancement for using a special skill, I did not take a
```

1    position.

2          Counsel for Mr. Jacox argued that it did not apply for

3    a whole host of reasons and he cited case law.  I believe that

4    Your Honor agreed with him that it did not apply and Your Honor

5    did not -- and I know that Your Honor did not apply those two

6    points.

7          THE COURT:  All right.  So you can respond, Mr. Docobo.

8    The primary reason is because of the 5K motion that was filed.

9    That's why there's this great disparity in this sentence.

10         MS. MAXWELL:  But there are other reasons that I would

11   like to tell the Court about.

12         THE COURT:  Just for everyone's information, the

13   original sentence was 90 months.  That was 60 months as to

14   Counts 1, 3, 4, and 5, and a consecutive 30 months as to

15   Count 6.

16         MS. MAXWELL:  No, it had to be a 60-month consecutive

17   because it was a 924(c).  It's reversed.

18         THE COURT:  I'm sorry.  It's reversed.  30 months as to

19   the original counts of 1, 3, 4, and 5, and a 60-month

20   consecutive sentence.

21         MR. DOCOBO:  That was the ultimate sentence, not his

22   guidelines.

23         MS. MAXWELL:  That was the ultimate sentence.

24         MR. DOCOBO:  His guidelines was much higher.  It was

25   almost as high as Mr. Hernandez's.

1       PROBATION OFFICER:  That is correct, because they were

2  looking at the same provisions without the -- because he also

3  didn't qualify for safety valve.

4       THE COURT:  All right.  So he ended up with a

5  90-month --

6       MS. MAXWELL:  He ended up --

7       PROBATION OFFICER:  He ended up with a total offense

8  level of 31 because he didn't get the special skill enhancement.

9       THE COURT:  All right.

10       PROBATION OFFICER:  Which results in a 108- to

11  135-month range.

12       THE COURT:  All right.

13       MS. MAXWELL:  I was just speaking to Mr. Barzee, Your

14  Honor, who is the attorney for Mr. Jacox.  It's his recollection

15  that his client received a 50 percent reduction based on his

16  cooperation.  The government had asked for a 33 percent

17  reduction.

18       MR. DOCOBO:  Judge, but I made it clear that he

19  received the 5K.  I never tried to hide the ball on that.  The

20  disparity is nevertheless huge.  My client has also been

21  debriefed.  My client has also given information.  Jacox

22  received his 5K because he was able to testify against

23  Hernandez, or agreed to testify against Hernandez.  And I fully

24  conceded that, in a vacuum, my client deserves a higher sentence

25  than Mr. Jacox, but this huge disparity is unjustified, in my

1    view, especially since I'm not asking -- I have no ability to go

2    below 15 years.  I'm merely asking for a 16.2-year sentence

3    ultimately to be reduced to a 15-year sentence.  I'm only asking

4    for 15 months under 3553.  And my justification is that there

5    would still be a huge disparity of less than 50 percent of the

6    sentence of Mr. Hernandez that Mr. Jacox would receive.

7            And there are some distinctions, which I recognize:  A,

8    Mr. Jacox made one less trip; and B, he did get the benefit of a

9    5K because of the government's position as far as how they were

10   going to prosecute the case.

11           If the shoe were on the other foot, Mr. Hernandez had

12   no reticence about also cooperating after the situation.  You

13   have to remember, part of the hesitation and part of the

14   slowness on the plea largely was due to my personal situation,

15   not Mr. Hernandez's reluctance or reticence about moving

16   forward.

17           THE COURT:  I'm not considering that at all.

18           MR. DOCOBO:  Okay.  I just wanted to make clear that

19   this has nothing to do with him dragging his feet or things like

20   that.  Things happen in life, which happened in this case.

21           THE COURT:  No one ever suggested that the Court was

22   concerned about the schedule of the case.  That's not an issue

23   whatsoever.

24           MR. DOCOBO:  Also, the abuse of trust issue Jacox

25   didn't get.

1          THE COURT:  Correct.

2          MR. DOCOBO:  And I understand that the Court ruled, but

3     the distinction between, you know, what these two men did

4     vis-a-vis abuse of trust, they both were officers.  Actually,

5     Jacox had a much higher position in the law enforcement scheme

6     of things.  He was a certified law enforcement officer.  My

7     client was a corrections officer.

8          THE COURT:  Mr. Docobo, the reason that your client

9     received that enhancement was because of his relationship with

10    the individual who eventually turned out to be the confidential

11    informant.

12         MR. DOCOBO:  That is correct.

13         THE COURT:  That was the basis for the Court's ruling.

14    Mr. Jacox was not factually involved in that scenario.  That was

15    the basis for the Court ruling that he was not subject to that

16    enhancement.

17         MR. DOCOBO:  That is correct.  Your Honor, I apologize,

18    I stand corrected on that.

19         THE COURT:  All right.  Anything further by either

20    side?

21         MS. MAXWELL:  Your Honor, I just wanted to respond very

22    briefly to some of the things that Mr. Docobo had said in his

23    initial plea to the Court.

24         He is correct that his client, Mr. Hernandez, took

25    three trips whereas Mr. Jacox only took two trips.  It is also

1    true that Mr. Hernandez is the one who actually transported the

2    drugs.  Mr. Hernandez took custody of those drugs and actually

3    had them in his possession when he transported them.

4            Mr. Docobo mentioned that but for the government's

5    zeal, for lack of a better term, that this case could have ended

6    after the first trip.  Mr. Hernandez basically stated to the

7    undercover police officer from the very beginning that he knew

8    other law enforcement personnel that wanted to be involved or

9    had -- that he could get involved.  I'm not sure what the exact

10   terms were.  But once he mentioned the possible involvement of

11   other Monroe County corrections officers, the agency felt it was

12   their duty to try to continue that investigation to find out who

13   these other people were.  And in fact, he mentions in the

14   transcripts that Your Honor received as part of the pleadings,

15   and it was mentioned briefly in my supplement, that he tried to

16   get other people involved, and those people, luckily for them,

17   decided not to do it, until he stumbled across Mr. Jacox who he

18   did convince to become involved in that.  So that is also

19   another thing that Your Honor could take into consideration.

20           He is not being enhanced for recruiting another

21   individual, but he certainly could be enhanced for recruiting an

22   individual.  He could be getting a two-level increase for

23   recruiting another person to be involved.

24           I have nothing further, Your Honor.

25           THE COURT:  Last word, Mr. Docobo, should you elect to

1    say anything.

2              MR. DOCOBO:  Judge, I trust your judgment, but I'm

3    asking for a 15-month reduction under 3553.

4              THE COURT:  I understand.

5              MR. DOCOBO:  And it didn't seem to me like it took much

6    persuasion to get Mr. Jacox involved.  And the hyperbole on the

7    tapes oftentimes is hyperbole.  He wasn't involved with any

8    other law enforcement officers and there were no law enforcement

9    officers and I beg to -- I don't think that surveillance would

10   demonstrate that there were other law enforcement officers that

11   were approached.  So a lot of this comes from hyperbole on a

12   tape.

13             We could extrapolate a lot more from that tape which

14   could be damning to Mr. Hernandez which turned out not to be

15   true.  So to take hyperbole in a tape and somehow spin it that

16   that's a fact I don't believe is something the Court will or

17   should take into consideration.

18             THE COURT:  All right.  Thank you very much.  The Court

19   has considered the statements of all parties, the presentence

20   report which contains the advisory guidelines, and the statutory

21   factors.  The Court shall impose a sentence at the low end of

22   the advisory guideline range, as it is felt this is sufficient

23   to deter any future criminal conduct.

24             It is the finding of the Court that the defendant is

25   not able to pay a fine.

1     It is the judgment of the Court that the defendant,

2     Shawn Hernandez, is committed to the Bureau of Prisons to be

3     imprisoned for 195 months.  This term consists of 135 months as

4     to Counts 1 through 5 and a term of 60 months as to Count 6, to

5     be served consecutively to Counts 1 through 5.

6     Upon release from imprisonment, the defendant shall be

7     placed on supervised release for a term of five years.  This

8     term consists of five years as to Counts 1 through 4 and 6, and

9     three years as to Count 5, all terms to run concurrently.

10    Within 72 hours of release from the custody of the

11    Bureau of Prisons, the defendant shall report in person to the

12    probation office in the district where released.  While on

13    supervised release, the defendant shall not commit any crimes,

14    shall be prohibited from possessing a firearm or other dangerous

15    devices, and he shall not possess a controlled substance.  He

16    shall cooperate in the collection of DNA and shall comply with

17    the standard conditions of supervised release and the following

18    special conditions:

19    Anger control, domestic violence treatment, substance

20    abuse treatment, and employment requirement as noted in Part G

21    of the presentence report.

22    The defendant shall immediately pay to the United

23    States a special assessment of $100 as to each count of

24    conviction, for a total of $600.

25    The total sentence, 195 months imprisonment, five years

1   supervised release, and a $600 special assessment.

2        Now that sentence has been imposed, does the defendant

3   or his counsel object to the Court's finding of fact or the

4   manner in which sentence was pronounced?

5        MR. DOCOBO:  Would you allow me to reiterate my

6   objections which were not withdrawn?  That would be the public

7   trust objection, as far as the PSI is concerned specifically.

8        THE COURT:  Yes, sir.

9        MR. DOCOBO:  And the consecutive sentence on the

10  924(c).

11       THE COURT:  Yes, sir.  Your objections are noted.

12       MR. DOCOBO:  Judge, additionally, if I might, I frankly

13  am drawing a blank as to the specific language of the PSI as far

14  as drug abuse history is concerned.  If there's a basis for that

15  in the PSI, I would ask for the drug program.  If I may look in

16  my PSI.  I don't want to misspeak on this point.  (Pause).  My

17  recollection is that it mentions something about marijuana use,

18  but I just want to double-check.

19       THE COURT:  Can the probation officer direct us to the

20  paragraph?

21       PROBATION OFFICER:  Yes, Your Honor, it begins in

22  paragraph 63.

23       THE COURT:  50 or 60?

24       PROBATION OFFICER:  63.

25       THE COURT:  All right.

```
 1            MR. DOCOBO:  It was marijuana and drinking, frankly.
 2            THE COURT:  One moment, one moment.  (Pause.)  The
 3   Court is going to recommend that the defendant participate in
 4   the 500-hour intensive drug and alcohol abuse program
 5   administered by the Bureau of Prisons.  Mr. --
 6            MR. DOCOBO:  And a south Florida -- I'm sorry.
 7            THE COURT:  Let me just finish with the sentence and
 8   then you can make any request.
 9            Mr. Hernandez, you do have the right to appeal the
10   sentence imposed.  Any notice of appeal must be filed within ten
11   days of the date the judgment is entered.  If you are unable to
12   pay the costs of an appeal, you may apply to proceed in forma
13   pauperis.  Discuss these rights with your lawyer so that you may
14   make an informed decision.  Do you understand your appellate
15   rights, sir?
16            THE DEFENDANT:  Yes, Your Honor.
17            THE COURT:  All right.  Additional requests?
18            MR. DOCOBO:  South Florida recommendation to the Bureau
19   of Prisons.
20            THE COURT:  The Court recommends that the defendant be
21   incarcerated in a facility as close to south Florida as possible
22   consistent with his security rating.
23            Additional requests?
24            MR. DOCOBO:  Nothing, Your Honor.
25            THE COURT:  There is a matter I would like to address
```

 1  with the parties.  The Court received a letter from Ms. Patricia

 2  Fitch wherein she states that she is unable to visit her son at

 3  the FDC.  Are you familiar with this issue, Mr. Docobo?

 4       MR. DOCOBO:  Ms. Perez is familiar with the issue.  May

 5  she address this point?

 6       THE COURT:  Certainly.

 7       MS. PEREZ:  Yes, Judge, this has already been resolved.

 8  The family has been put on the list, Judge.

 9       THE COURT:  It is resolved?

10       MS. PEREZ:  Yes.

11       THE COURT:  Very well.  Anything further by the

12  government?

13       MS. MAXWELL:  No, Your Honor.  Thank you.

14       UNIDENTIFIED SPEAKER:  (Inaudible).

15       THE COURT:  Did I hear --

16       MS. PEREZ:  Judge, my client indicated that it's been

17  resolved.

18       UNIDENTIFIED SPEAKER:  We haven't talked.  We haven't

19  seen him.  We haven't seen him since he's been arrested.

20       MS. PEREZ:  They haven't been able to see him, Judge,

21  but we were able to basically speak to the counselor on the last

22  few days and the counselor has just recently put the family on

23  the list because they weren't doing it before.  And I was going

24  to become involved and Shawn indicated to me about two days ago

25  that they had actually been placed on the list.  So I believe

```
 1    that they could visit.  But Judge, again, if it comes to my
 2    attention that they're not able to visit him within the next
 3    couple of days --
 4              THE COURT:  All right.  Just bring it to the Court's
 5    attention.  If they're on the list they should be able to visit.
 6    If there are any problems that the Court can assist, please let
 7    me know immediately.
 8              MS. PEREZ:  Absolutely, Judge, I will notify the Court
 9    immediately.
10              THE COURT:  All right.  Thank you very much.  Thank you
11    all.  We are in recess.
12         (Proceedings concluded at 4:45 p.m.)
13                        *   *   *   *   *
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1   UNITED STATES OF AMERICA                    )
                                                 )   ss:
2   SOUTHERN DISTRICT OF FLORIDA                 )

3

4                    C E R T I F I C A T E

5       I, Carly L. Horenkamp, Certified Shorthand

6   Reporter in and for the United States District Court for the

7   Southern District of Florida, do hereby certify that I was

8   present at and reported in machine shorthand the proceedings had

9   the 4th day of November, 2009, in the above-mentioned court;

10  and that the foregoing transcript is a true, correct, and

11  complete transcript of my stenographic notes.

12      I further certify that this transcript contains

13  pages 61 - 106.

14      IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15  Florida, this 15th day of May, 2010.

16

17

18                 s/ Carly Horenkamp

19                 Carly L. Horenkamp, RMR, CRR
                   Certified Shorthand Reporter

20

21

22

23

24

25
```